## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOCIAL RANGER, LLC, a Delaware limited liability company, | **C.A. NO. 14-1525-LPS** |
| *Plaintiff,* | ███████████████████████ |
| v. | |
| FACEBOOK, INC., a Delaware corporation, | **PUBLIC - REDACTED VERSION** |
| *Defendant.* | |

## PLAINTIFF SOCIAL RANGER, LLC'S BRIEF IN OPPOSITION TO FACEBOOK, INC.'S MOTION FOR SUMMARY JUDGMENT

Kenneth L. Dorsney (I.D. #3726)
Mary B. Matterer (I.D. #2696)
**Morris James LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com
mmatterer@morrisjames.com

**ATTORNEYS FOR PLAINTIFF
SOCIAL RANGER, LLC**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................1

II.     STATEMENT OF FACTS ........................................................................................3

     A.      Facebook and Myspace Compete as the Largest Social Networks.........................3

     B.      Facebook Launches the Facebook Platform and Promises Developers
            They Can Keep All the Revenue They Generate......................................................4

     C.      The Virtual-Currency Services Market Develops to Serve the Social-Game
            Network Market ......................................................................................................5

     D.      Facebook Achieves Immense Success from the Platform, which Was
            Operating Alongside the Competitive Virtual-Currency Services Market.............6

     E.      Facebook Contemplates Monopolizing the Market for Virtual-Currency
            Services on Social-Game Networks........................................................................6

     F.      Facebook Enters the Competitive Virtual-Currency Services Market with
            Credits, but Fails ....................................................................................................7

     G.      Facebook Decides to Monopolize the Virtual-Currency Services Market
            for Social-Game Networks .....................................................................................7

            1.      The Internal Debate......................................................................................7

            2.      The Plan .......................................................................................................7

            3.      Facebook Locks in the Industry and Lies About its Plan ............................8

     H.      Facebook Executes The Plan ..................................................................................9

            1.      Facebook Forces the Head Developers Into Credits and Exclusivity
                Agreements ..................................................................................................9

            2.      Facebook Announces and Enforces the Mandate. ......................................9

     I.      Imposition of Credits Harms Developers, Raises Price, and Limits Choice .........10

     J.      Facebook's Conduct Destroys the Once Competitive Virtual-Currency
            Services Market for Social-Game Networks .........................................................10

     K.      The Rise of a Separate Market for Mobile Platforms ...........................................11

III.     ARGUMENT..........................................................................................................12

     A.      There is Ample Evidence to Support Social Ranger's Market Definitions ...........12

            1.      There is Significant Factual Evidence that the Social-Game
                Network Market Does Not Include Mobile or Other Platforms. ...............13

            2.      Facebook Repeatedly Admitted that Social-Game Networks Are
                Different Than Mobile or Other Platforms. ...............................................14

            3.      There is Significant Economic Evidence and Analysis Supporting
                Social Ranger's Definition of the Social-Game Network Market. ...........15

i

4. Facebook's Arguments in Favor of Including Mobile Platforms Are Invalid. ..................................................................................16

5. There Is Ample Evidence that the Second Market Is Virtual-Currency Services Provided to Developers on Social-Game Networks. ......................................................................................19

    (a) Facebook Looks at the Question Backwards. ................19

    (b) Additional Evidence Supports a Market for Virtual-Currency Services on Social-Game Networks..........................21

B. The Court Should Not Dismiss Social Ranger's Tying Claim. ...........................22

1. Social Ranger Has a Valid Tying Claim Under the Per Se Rule ..............23

    (a) The Third Circuit's *En Banc* Opinion in *Town Sound* Requires Application of the Per Se Rule .......................23

    (b) Facebook Tied Access to its Social-Game Network with Purchase of Its Virtual-Currency Services.....................23

    (c) Facebook Had Market Power in the Social-Game Network Market ....................................................24

2. Facebook's Tying Arrangement Also Violated the Rule of Reason..........25

C. The Court Should Not Dismiss Social Ranger's Monopolization Claim .............25

1. Facebook Monopolized the Market for Virtual-Currency Services on Social-Game Networks ........................................25

    (a) There Are Numerous Factual Issues Regarding the Durability of Facebook's Monopoly and Barriers to Entry ..........25

    (b) There Is Ample Direct Evidence of Facebook's Monopoly Power. .....................................................27

2. There Is Ample Evidence that Facebook Engaged in Improper Conduct .........................................................27

    (a) Facebook's Policies Cannot be Fairly Characterized as a Charge for Distribution..................................28

    (b) The Mandate Cannot be Fairly Characterized as "Vertically Integrat[ing] Payment Processing Into Its Core Platform Services" ..............................................29

    (c) There Is Extensive Evidence that Facebook's Mandate Was Not Motivated by Concerns over the Quality of User Experience...............................................29

    (d) There Are Other Relevant Factual Disputes .................32

D. The Court Should Not Dismiss Social Ranger's Attempted Monopolization Claim ...............................................33

E.      Social Ranger Has Demonstrated the Anticompetitive Effects of
        Facebook's Challenged Conduct .......................................................................33

F.      Facebook's Motion Relies on Inadmissible Evidence or Incomplete
        Argument ............................................................................................................35

## **TABLE OF AUTHORITIES**

**Page**

### Cases

*Avaya Inc., RP v. Telecom Labs, Inc.*,
    838 F.3d 354 (3d Cir. 2016) ............................................................................. 21, 25

*Barr Labs., Inc. v. Abbott Labs.*,
    978 F.2d 98 (3d Cir. 1992) ..................................................................................... 33

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007) ................................................................ 13, 17, 30, 32

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
    140 F.3d 494 (3d Cir. 1998) ................................................................................... 13

*Burrell v. Minn. Mining Mfg. Co.*,
    2011 WL 5458324 (E.D. Pa. June 9, 2011) ........................................................... 35

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) .............................................. 13, 21, 24, 25, 29, 30, 31

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016) ................................................................................... 23

*Elliot v. United Center*,
    126 F.3d 1003 (7th Cir. 1997) ............................................................................... 20

*Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327 (3d Cir. 2016) ................................................................................... 15

*Fineman v. Armstrong World Indus., Inc.*,
    980 F.2d 171 (3d Cir. 1992) ................................................................................... 12

*Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*,
    868 F.2d 59 (3d Cir. 1989) ..................................................................................... 35

*HDC Med., Inc. v. Minntech Corp.*,
    474 F.3d 543 (8th Cir. 2007) ................................................................................. 33

*Int'l Bus. Machs. Corp. v. United States*,
    298 U.S. 131 (1936) ................................................................................................ 29

*Intellective, Inc. v. Mass. Mut. Life Ins. Co.*,
    190 F. Supp. 2d 600 (S.D.N.Y. 2002) ................................................................... 20

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ........................................................................................ 24, 28, 29

*John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*,
    119 F.3d 1070 (3d Cir. 1997) ................................................................................. 35

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
    762 F.3d 1114 (10th Cir. 2014) ............................................................................. 26

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ............................................................... 32

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
   838 F.3d 421 (3d Cir. 2016) ................................................. 26, 30, 34

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ......................................................... 30

*Orson, Inc. v. Miramax Film Corp.*,
   79 F.3d 1358 (3d Cir. 1996) ............................................................... 34

*Phillis v. Harrisburg Sch. Dist.*,
   430 F. App'x 118 (3d Cir. 2011) ....................................................... 35

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ......................................................... 13, 27

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010) ......................................................... 28, 30

*Times-Picayune Publishing Co. v. United States*,
   345 U.S. 594 (1953)............................................................................ 34

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998) ................................................................ 26

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
   959 F.2d 468 (3d Cir. 1992) ............................. 20, 21, 22, 23, 24, 25

*UCB, Inc. v. Accord Healthcare, Inc.*,
   2016 WL 4376346 (D. Del. Aug. 15, 2016) ..................................... 35

*Ungar v. Dunkin' Donuts of Am., Inc.*,
   531 F.2d 1211 (3d Cir. 1976) ............................................................ 24

*United States v. American Express Co.*,
   838 F.3d 179 (2d Cir. 2016) ....................................................... 34, 35

*United States v. Grinnell Corp.*,
   384 U.S. 563, 573 (1966)................................................................... 22

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001).............................................................. 22

*Yeager's Fuel, Inc. v. Pa. Power & Light Co.*,
   953 F. Supp. 617 (E.D. Pa. 1997) .................................................... 13

### Treatises

U.S. Dep't of Justice & Fed. Trade Comm'n,
   *Merger Guidelines* § 3.2 (1997) ...................................................... 26

U.S. Dep't of Justice & Fed. Trade Comm'n,
   *Horizontal Merger Guidelines* § 4 (2010) ...................................... 13

**Additional Authorities**

Dennis W. Carlton,
   *Market Definition: Use and Abuse*,
   COMPETITION POL'Y INT'L, Spring 2007 ................................................................ 26

2B Phillip E. Areeda et al.,
   *Antitrust Law* ¶ 565a (4th ed. 2014) .................................................................17

## I.    Introduction and Summary of the Argument

In 2011, Facebook destroyed an entire industry. For years, companies like Super Rewards provided game developers with virtual-currency services, which are services that allow developers to monetize games on social-game networks. Social game networks are social networking websites where these game developers are able to offer games that utilize the distinct features of the underlying social network. But in July 2011, that all changed. By that time, Facebook had become the dominant social-game network, leaving others like Myspace, hi5, and Bebo in the dust. However, its own virtual-currency service, called Facebook Credits, was struggling to gain traction in the competitive market.

So in July 2011, Facebook issued a policy mandating that all developers exclusively use Facebook Credits for games offered on Facebook's social-game network (the "Platform"). By implementing this policy (the "Mandate"), Facebook leveraged its dominance in the social-game network market to overtake the virtual-currency services market altogether. Overnight, the thriving market, in which companies like Super Rewards had competed on price, features, and service, was gone. Left with no alternative, developers were forced to pay a significantly higher price and receive a lesser product from Facebook.

Facebook does not contest the underlying facts. Instead, Facebook's motion is premised on its claim that mobile platforms *must* be included in both relevant markets, because they are allegedly substitutes for social-game networks. But market definition is a quintessential issue of fact for the jury to resolve in an antitrust case. The markets must be defined from the perspective of the consumers of the relevant products or services, which are the game developers here. There is significant evidence that social-game networks and mobile platforms are different and not substitutes for each other. Offering games on mobile platforms rather than social-game networks necessitates different game distribution, business models and game design. Social-game

networks have different technical requirements and provide access to distinct game players. And all of this is true even when a developer offering games on mobile platforms can access Facebook's social graph, given the unique environment found on an active and existing social networking website. Facebook ignores these critical distinctions and instead improperly attempts to define the markets from the perspective of game players or virtual-currency service providers. In addition, Social Ranger's expert has provided extensive, unrebutted evidence that Facebook's ability to force a more than 25% increase in prices on game developers (which it did through the Mandate) – and to maintain those prices to the present – demonstrates that the relevant markets include only social-game networks.

Facebook's arguments do not entitle it to summary judgment for at least four reasons.

First, Facebook asserts that Social Ranger's monopolization claims fail because mobile platforms must be included in the relevant markets (and if they are, Facebook's share of the market for virtual-currency services would be just 15%). However, in a properly defined market, Facebook's share of the market is 100%, and it has been close to that since 2011. As noted above, there is ample factual and economic evidence to confirm that mobile platforms should not be included in the relevant markets.

Second, Facebook argues that Social Ranger's monopolization claims fail because Facebook did not engage in any improper conduct. Facebook argues the Mandate was nothing more than a charge for game distribution and its attempt to vertically integrate into the payment processing business. But Facebook's internal documents show that Facebook charged 30% for virtual-currency services. And a monopolist requiring customers to buy a separate, but related, product is not vertical integration, but rather constitutes unlawful tying. Moreover, the evidence shows that Facebook overtook the virtual-currency services market because Facebook Credits

failed. This was deliberated and planned before any of Facebook's post-hoc justifications for the Mandate, such as its alleged concerns over "scams" or privacy.

Third, Facebook bases its entire defense of Social Ranger's tying claim on the definition of the relevant markets and the purported justifications for its conduct, neither of which withstands scrutiny or provides a basis for summary judgment. Under the Third Circuit's "per se" rule against tying arrangements, Facebook's disputed justifications for its conduct are not legally relevant. And Social Ranger has proffered sufficient evidence to sustain a tying claim even under the standard that Facebook proposes. Indeed, Facebook's expert concedes that Facebook's Mandate led to fewer game developers and fewer games, which invariably harms game users.

Finally, Facebook asserts that Social Ranger's claims fail because it has not demonstrated anticompetitive effects on game players. But that showing is not required under applicable law. And regardless, the evidence shows that players have been harmed by the lack of competition and innovation in the relevant markets, all of which was caused by Facebook's conduct.

Facebook must demonstrate that "there is no genuine dispute to any material fact," and Social Ranger can defeat the motion by showing there is "evidence on which the jury could reasonably find for [it]." Here, there is ample evidence to support Social Ranger's claims, and, at a minimum, numerous factual disputes exist concerning the definition of the relevant product markets and Facebook's conduct, among other issues.

## II.      Statement of Facts

### A.      Facebook and Myspace Compete as the Largest Social Networks

In Facebook's earliest days, Myspace was its biggest competitor. *See* Zuckerberg Dep. 17:4-7. Despite Facebook's efforts to surpass Myspace, Myspace still had more users as of May

2007. Ex. 20,[1] at Ex. 2. Facebook also competed with other social networks, like Bebo and hi5.

Ex. 18 ¶112.

### B.      Facebook Launches the Facebook Platform and Promises Developers They Can Keep All the Revenue They Generate

In May 2007, Facebook founder and CEO Mark Zuckerberg publicly announced the

Facebook Platform, a development environment for third party developers to create social

applications and build businesses on top of Facebook's social graph. Ex. 113 at 8. Mr.

Zuckerberg promised prospective developers: "So you can run ads, or you can do transactions,

and we encourage both." Ex. 17, at 73; Ex. 113 at 15. Mr. Zuckerberg also said "Now, if you

don't want to run ads, then you can just go ahead and sell something, or you can do transactions

on your site. And it's the same deal with advertising. You get to keep all of the revenue." Ex. 17,

at 73; Ex. 113 at 15.

Mr. Zuckerberg testified that his promises were intended to encourage developers to

invest in creating applications for Facebook because Facebook did not have the ability to create a

broad range of applications itself. Ex. 17, at 33-34; Ex. 8, at 28. Both developers and (later)

virtual-currency service providers relied on Mr. Zuckerberg's statements to do just that. S*ee e.g.*,

Ex. 9, at 34-36; Ex. 4, at 487-489; Ex. 5, at 127-128.

Social networking websites such as Myspace, hi5, and Bebo also launched open

platforms for third party developers, each giving developers the flexibility to build and monetize

their applications as they saw fit. *See* Ex. 18, ¶¶ 115-24.

It soon became clear that the most successful applications on these social networking

websites were games. *See* Ex. 17, at 83. These games were different than existing games on other

---

[1]  "Ex. _" refers to the exhibits attached to the accompanying Declaration of David Elihu in Support of Plaintiff Social Ranger, LLC's Opposition to Defendant Facebook, Inc.'s Motion for Summary Judgment.

platforms and utilized the players' pre-existing social graph for discovery, distribution, progression, engagement, and retention. *See* Ex. 22, ¶¶ 28, 35, 46-49; Ex. 19, ¶¶ 16-19.

### C.    The Virtual-Currency Services Market Develops to Serve the Social-Game Network Market

Most social-game developers adopt a "free-to-play" business model, under which users play games for free, with the option to buy, earn, or receive from their friends "virtual currency," such as coins or gems. Ex. 19, ¶¶ 65-66. Players can then use this virtual currency to obtain functional items like an in-game shovel or power-up, to advance to a higher level, or to acquire electronic decorative accessories. *Id.*

Game developers on social-game networks thereby monetized their games by allowing gamers to directly purchase virtual currency or to "earn" it by interacting with an incentivized ad. *Id.* ¶¶ 65-80; Ex. 28. For example, a player could sign up for a free trial to Netflix in exchange for in-game currency. Ex. 11, at 63. Managing this complex environment was beyond the expertise of most developers, so outside companies began providing these services, and the market for virtual-currency service providers was born. Ex. 38, at 21, 34-35; Ex. 17, at 86.

The virtual-currency service providers managed relationships with advertisers and payment processors, built technology to provide direct pay and advertising-offer transactions for virtual currency, developed technology to detect and combat fraud, and provided customer service for gamers and developers. Ex. 3, at  41-42; Ex. 22, at ¶ 51 n. 77; Ex. 18, at ¶ 73.

The market for the provision of virtual-currency services on social-game networks became highly competitive, with providers competing on price, monetization optimization, advertising options, payment method options, customer support, and user analytics. Ex. 18, at ¶¶ 72-73. The companies that emerged in this space included the industry leaders Super Rewards and Offerpal, along with Trialpay, Gambit, and others. *See id.* at ¶¶ 72. Their services were used

by developers on all then-existing social-game networks. *Id.*; Ex. 111, at 3; Ex. 3, at 66.

Super Rewards was founded in 2007, and it quickly became a leading provider of virtual-currency services on social-game networks. Ex. 38, at 22. Facebook viewed Super Rewards as a leader in the market. Ex. 35.

### D. Facebook Achieves Immense Success from the Platform, which Was Operating Alongside the Competitive Virtual-Currency Services Market

As early as 2008, the Platform became a "key strategic effort" that "led to tremendous adoption by both the developer community as well as [Facebook] users." Ex. 93. One Facebook employee called gaming a "pot of gold [Facebook] stumbled across." Ex. 47. In fact, by 2011, Facebook was making ██████████ a year in Platform-related advertising revenue. Ex. 58, at 13.

### E. Facebook Contemplates Monopolizing the Market for Virtual-Currency Services on Social-Game Networks

Facebook soon contemplated taking over the market for virtual-currency services. Specifically, in 2008, Facebook considered the impact of "████████████████████" in the market for virtual-currency services on the Platform and forcing developers to use Facebook for those services. Ex. 45, at 2. Facebook predicted that offering its virtual-currency services product ██████ and ████████████████," would be "████████████████████,'" and that ████████████████████████████" such as Myspace. *Id.* While Facebook would benefit by gaining "██████████████ Facebook recognized there was ██ ████████████████████████████ and its conduct would be ████████████ *Id.* at 4; *see also* Ex. 92, at 2 ████████████████████████ ████████████████████████ Facing continued competition from Myspace's social-game network, Facebook decided instead to "[c]ontinue open platform positioning and gain share" in the social-game network market before making its move in the virtual currency market. Ex. 45, at 4; *see also* Ex. 102; Ex. 17, at 111-115.

**F.     Facebook Enters the Competitive Virtual-Currency Services Market with Credits, but Fails**

In May 2009, Facebook decided it would try to compete in the virtual-currency services market and launched Credits. Facebook offered Credits at a 30% revenue share, Ex. 17, at 150, which developers perceived as expensive when compared to the 10-20% that Super Rewards and others charged. *See* Ex. 11, at 146.

Credits failed miserably due to its high price, low quality, and fewer services. *See, e.g.*, Ex. 32 ("Developers are concerned about paying 30% for something they get today for . . . 10% from Super Rewards."); Ex. 29; Ex. 22, at ¶¶ 55, 234; Ex. 17, at 150:13-19.

**G.     Facebook Decides to Monopolize the Virtual-Currency Services Market for Social-Game Networks**

**1.     The Internal Debate**

In early October 2009, Mr. Zuckerberg wrote internally that Facebook's deal with developers should be further sweetened by sharing Facebook's own advertising revenue with them. *See, e.g.*, Ex. 97 at 2, 4; Ex. 82; Ex. 100, at 4. Facebook Chief Operating Officer Sheryl Sandberg pushed back aggressively in a private email to Mr. Zuckerberg:



Ex. 100, at 5-6 (emphasis added). Mr. Zuckerberg disagreed that Facebook should harm developers, and was concerned that there was ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆ *Id*. at 2 .

**2.     The Plan**

Despite Mr. Zuckerberg's initial reluctance, on October 10, 2009, Mr. Zuckerberg and

Ms. Sandberg decided on a two-step plan to force Platform developers to use Facebook Credits: (1) First, Facebook would coerce the largest developers to use Credits exclusively, ███████ █████████████████████████████████████████████ and once that was done, (2) Second, once the large developers were using Credits, force Credits on the rest of the market (the "Plan"). Ex. 65, at 4-6. ████████████████████████████████ ████████ Ex. 88, at 18 ████████████████████████████████ ███████; Ex. 36, at -775 ███████████████████████.

By 2011, Facebook had at least 73% market share in the social-game network market, measured by the number of users of social networking services. Ex. 20, at Ex. 4. Facebook knew the Plan would succeed because Myspace and other social-game networks were dropping off the map, *see* Ex. 87, at 4-5, and developers, including the largest one, Zynga, would have nowhere else to go, *see e.g.*, Ex. 34 ██████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████; Ex. 95; Ex. 65, at 2.

### 3. Facebook Locks in the Industry and Lies About its Plan

Facebook told the public, falsely, that it had no Plan to mandate the use of Credits. Facebook's deception had two purposes: (1) to lock in those developers who were already on the Platform, and reduce the chance that they would attempt to move their business to the fledgling Myspace platform; and (2) to continue to encourage new investment in the Platform. *See* Ex. 66, at 4. In a series of emails, Facebook's Chief Financial Officer was instructed to ensure that the Plan ████████████ Ex. 73; *see also* Ex. 74. Similarly, Facebook falsely informed the Los Angeles Times (Ex. 30), New York Times (twice) (Ex. 31; Ex. 62), USA Today (Ex. 61), Wall Street Journal (Ex. 114) and industry analysts (Ex. 59) that Facebook had no plan to force developers to use Credits.

### H.    Facebook Executes The Plan

#### 1.    Facebook Forces the Head Developers Into Credits and Exclusivity Agreements

Pursuant to the Plan, Facebook successfully forced top developers to enter into exclusive Credits deals, despite their resistance.  Facebook was only able to "sign" deals with these developers by threatening to kick them off the Platform. *See* Ex. 71.[2]

#### 2.    Facebook Announces and Enforces the Mandate.

On January 24, 2011, having acquired the market power to force all developers to use Credits, Facebook implemented the second part of the Plan. Facebook announced that effective July 1, 2011, Facebook Credits would become the exclusive virtual-currency service provider for games on the Facebook Platform (the "Mandate"). Ex. 109. The Mandate specifically required that Credits would be the "sole and exclusive payment method for all virtual goods and currencies made available to users" within games on the Facebook Platform. Ex. 110. Further, it required that all advertising offers be supplied by Facebook through its partnership with TrialPay. Ex. 110 at 2; *see* Ex. 112, at 4.

Facebook accompanied the Mandate with new policies that reached well beyond the Platform. Specifically, in July 2011, Facebook issued revised terms for Facebook Credits providing, among other things, that (a) pricing on Facebook.com for virtual goods must be the same as on developers' own websites or other apps, when the user was logged into Facebook; (b) developers could not incentivize logged-in Facebook users to make purchases on developers' websites or applications on another platform; and (c) virtual currency could not be used across different games, either on or off the Facebook Platform. Ex. 83. Soon thereafter, Facebook also

---

[2]  *See also* Ex. 68, at -300, 303; Ex. 90, at 27; Ex. 98; Ex. 99; Ex. 72; Ex. 12, at 56, 77; Ex. 91, at 38.

mandated that any games on Facebook "may not integrate, link to, promote, distribute, or redirect to any app on any competing social platform." Ex. 85. In September 2012, Facebook instituted another policy that prohibited linking to or promoting stand-alone game websites off of Facebook.com. Ex. 86.

At the time it instituted the Mandate and other policies, Facebook employees knew Credits was ▮▮▮▮▮▮▮▮▮ Ex. 43, and ▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 46. Similarly, two weeks before the Mandate went into effect, Mr. Zuckerberg expressed concern to Ms. Sandberg about the poor quality and high price of Credits:



(Ex. 94, at 2).

## I. Imposition of Credits Harms Developers, Raises Price, and Limits Choice

Developer response to the Mandate was overwhelmingly negative. Developers complained that using Credits significantly harmed their bottom line, leading to decreases in developer revenue of up to 70%. Ex. 25; Ex. 33, at 3; Ex. 52; Ex. 70, at 12; Ex. 55; Ex. 69, at 4 (Credits is ▮▮▮▮▮▮▮▮▮."). Developers also complained that Facebook Credits lacked important payment options, Ex. 10, at 85-86; Ex. 70, at 10, that the available offer ads were limited, Ex. 51; Ex. 54, and that Facebook's customer service was inferior to other virtual-currency services providers, Ex. 63, at -474; Ex. 50. Developers lost money. Some had to shut down because of the Mandate. Ex. 19, at ¶¶ 109-10; *see also* Ex. 5, at 60. The ones that survived had reduced incentives to improve existing or build new games. *Id.*, at 114-115, 216.

## J. Facebook's Conduct Destroys the Once Competitive Virtual-Currency Services Market for Social-Game Networks

After the Mandate, independent providers of virtual-currency services to developers on

social-game networks disappeared. Ex. 123. The assets of Super Rewards, whose virtual

currency business for social-game network developers was earning $7.7 million in sales net

revenue the month leading up to the Mandate, Frankel Ex. 3, were sold in July 2012 for $1.8

million, Ex. 106, at 23; Ex. 105, at 15, 17.

Soon after the Mandate, Facebook issued its initial public offering at a valuation of

approximately $104 billion, thanks in part to ████████ in Platform-related revenue in 2011.

Ex. 58, at 13; Ex. 115.

### K.      The Rise of a Separate Market for Mobile Platforms

While Facebook enjoyed great success from its social-game network, mobile devices also

saw an explosion in usage thanks to the increased prominence of smartphones and tablets.

Although developers began making games for the Apple iOS and Google Android operating

systems, these platforms were different in fundamental ways from social-game networks:

(1) *Social Distribution and Use of the Social Graph.* Unlike mobile platforms, players

on social-game networks can play and interact with their existing connections while visiting the

social-networking website without having to first spend money to purchase the game, invest time

to download or install a game, or access the game through a separate application. *See* Ex. 42, at

2-3; Ex. 22, at ¶¶ 41–45; Ex. 9, at 40-44, 58-60; Ex. 1, at 23-24. Games on social-game networks

can be played casually while a player is interacting with other parts of the social networking site.

*See* Ex. 22, at ¶ 30; Ex. 48. at 2; Ex. 9, at 38. That cannot be done on mobile platforms.

Unlike mobile platforms, social-game networks offer social-game developers a

mechanism for the widespread distribution of their games—namely, the players' existing social

connections or "friends" on the social-networking website. Ex. 18, at  ¶¶ 21, 32, 39-40; Ex. 14, at

63–64; Ex. 76, at 2-5; Ex. 9, at 39; Ex. 12, at 20. Other game platforms, like mobile, simply do

not have the "kind of social features" that a social-game network does. Ex. 9, at 53.

(2) **Business Models and Game Design.** Because of the different audiences, games on a social games network are almost exclusively simple, while games on mobile platforms are typically more complex, utilizing intricate story lines, graphics, and brand names (e.g., FIFA or Madden NFL). Ex. 22, at ¶ 36. In addition, developers on mobile platforms need to spend significant money on optimizing placement in mobile app stores, rather than relying on viral distributions like on social game networks. Ex. 22, at ¶¶ 121, 175-86.

(3) **Technical Differences.**  Developers on social-game networks must host their games on their own servers (even though the games are accessed through Facebook's website), while games on mobile platforms are downloaded from an app store and installed on the local smartphone or tablet. Ex. 22, at ¶¶ 39-40. Games on social-game networks are typically written in Flash, while games on mobile platforms are written in significantly more complex languages. Ex. 22, at ¶¶ 24, 156, 160. Games on mobile platforms also require a different engineering, Ex. 9, at 63-64, larger monetary investment, Ex. 18, at ¶¶ 34, 172, and adaptation to the smaller screen sizes and different input methods (mouse/keyboard vs. touch) found on mobile devices. Ex. 22, at ¶¶ 35, 156, 158, 201, 228; Ex. 18, at ¶¶ 153-56; Ex. 9, at 45.

## III.   <u>Argument</u>

### A.   There is Ample Evidence to Support Social Ranger's Market Definitions

Social Ranger has defined two product markets in this case. The first is the market for social-game networks, which are social networking websites where developers are able to offer games utilizing the underlying social graph. The second is the market for virtual-currency services for those games on social networks.

Determining "a relevant product market . . . is a highly factual one best allocated to the trier of fact." *See Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992). As the moving party, Facebook must show that "its market theory describes the actual market

behavior so accurately that the nonmoving party's assertion of the moving party's market power if not implausible, is at least unreasonable. The Supreme Court has defined this burden as substantial." *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 645 (E.D. Pa. 1997) (citations and quotations omitted); *see also Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).

Markets are defined from the perspective of consumers, not producers. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998) ("The outer boundaries of a product market are determined by evaluating which products would be reasonably interchangeable *by consumers* for the same purpose." (emphasis added)); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("The test for a relevant market is . . . commodities *reasonably interchangeable by consumers* for the same purposes.") (emphasis added) (quotations omitted)); U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4 (2010) ("Market definition focuses solely on demand substitution factors."). Here, the "consumer" is the game developer who uses social-game networks in the first market in order to be able to offer its games, and virtual-currency services in the second market in order to monetize them. *See* Ex. 20, at ¶ 109.[3]

**1.    There is Significant Factual Evidence that the Social-Game Network Market Does Not Include Mobile or Other Platforms.**

The social-game network market is consistent with "the commercial realities faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (quotations omitted)) ("*Kodak*"). Social Ranger's two industry experts provide opinions on the

---

[3] Courts may also consider "relevant sources of supply" to identify actual rivals or eager potential entrants. Mot. at 14. But Facebook's conduct prohibited ***all*** competitors in the virtual-currency services market for social game networks, so the existence of potential entrants is immaterial; any potential entrants, like the existing competitors, were excluded from the market.

critical differences faced by developers building games on social-game networks and elsewhere. Their opinions, and the documents and testimony underlying them, provide sufficient support for a jury to find that social-game networks were a unique industry for developers.

As explained above, there are numerous differences between social-game networks and other platforms. *Supra* § II(B)-(C), II(K). This includes the use of social distribution and virality tools, game design and developer business models, and technical differences. In addition, the use of social distribution tools, as well as the ability to obtain user engagement and re-engagement through those tools, is fundamentally more effective on social-game networks than it is on other platforms, such as mobile operating systems. Ex. 22, at ¶ 49; Ex. 23, at ¶¶ 101-106; Ex. 18, at ¶¶ 38, 158; Ex. 19, at ¶¶ 16-17, 56, 58, 60, 63, 92-95; Ex. 9, at 121-22. In light of this, Vishal Makhijani from leading game developer Zynga testified that developers did not view mobile networks as equivalent to social-game networks. *See* Ex. 12, at 19-20. Similarly, Digital Chocolate CEO, another developer, testified that switching to a mobile platform from a social-game network would be "an extremely difficult pivot to make" because the "platforms are different, the business models are different, the features are different." Ex. 9, at 105.

### 2. Facebook Repeatedly Admitted that Social-Game Networks Are Different Than Mobile or Other Platforms.

Facebook recognizes that social-game networks are a different market than other platforms, including mobile platforms. For example, Mr. Zuckerberg saw "social distribution" as Facebook's "unique advantage." Ex. 101.[4] In another email, a company executive explained that,

---

[4]   In an email to Apple's Steve Jobs, Mr. Zuckerberg explained the uniqueness of social-game networks, and how other destinations are not substitutes: "The vast majority of people who play [social] games don't consider themselves gamers and would not go out of their way to play games. If they had to go to a separate site to play games, they just wouldn't do it and they'd stop playing the games. That's why these game companies like Zynga need to be in an environment like ours rather than building out their own websites." Ex. 48, at 2.

"Facebook is primarily about social distribution, so I think developers should expect the bulk of their traffic/installs to come from viral channels. In that regard, I would think that *we are fundamentally different than Apple*." Ex. 24 (emphasis added). Facebook's head of gaming said Facebook "can't find any data to support" the possibility that mobile operating systems were substitutes to Facebook Platform. Ex. 77, at 1. In fact, internal Facebook emails confirm that the company did not consider Apple to be a competitor, despite Facebook's opposite position here. Ex. 81, at 5; Ex. 80; Ex. 37.[5] Facebook further admits that, for game developers, the use of email and phone contacts, Mot. at 14, is not a substitute for the use of Facebook's social graph on Facebook.com. *See* Ex. 17, at 227.

> ### 3. There is Significant Economic Evidence and Analysis Supporting Social Ranger's Definition of the Social-Game Network Market.

One way economists commonly attempt to define markets is to conduct a "hypothetical monopolist test." "[I]f a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") [typically 5%] in the proposed market, the market is properly defined. If, however, consumers would respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow." *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 & n.1 (3d Cir. 2016) (citations and footnotes omitted).

Social Ranger's expert, Dr. Frankel, conducted a hypothetical monopolist test to analyze the markets, and to evaluate Facebook's market power.[6] Dr. Frankel found that Facebook's conduct increased the effective cost to developers by at least 25%, which was "far greater than

---

[5]   In internal emails, Facebook recognized that it literally now has no competitors. It is the only viable social game network in the United States. *See* Ex. 42, at 4.

[6]   Dr. Frankel offered additional analysis and opinions, including regarding the impact and effect of Facebook's anti-steering rules (see supra § II(H)(2)) and the narrowing impact they had on the definition of the social game network market. *See* Ex. 20, at §§ 3.2.6, 3.3.4, 5.1, 5.2.

the 5-10 percent threshold commonly used in applying the hypothetical monopolist test." Ex. 20, at ¶ 137. He opined that if the market were broader than social-game networks and included mobile platforms, "then even a 5-10 percent price increase on the Facebook Platform would prove to be unprofitable to Facebook" and "it would be in Facebook's interest to hold prices at or reduce them back to the competitive level." *Id.*

Here, the "hypothetical monopolist test" is not hypothetical. Facebook has never reduced its 30% fee for Credits, and ***there is no evidence of even a single developer who "switched" a game from Facebook.com to any of the other alleged substitute platforms***, in response to the 25% or more price increase. Ex. 5, at 317-18; *see also* Ex. 6, at 154-57.

Facebook's expert has not conducted a hypothetical monopolist test. Ex. 5, at 277. Facebook has not disputed Dr. Frankel's analysis, nor does it even mention it in its motion.

Moreover, if as Facebook contends, Apple and Google competed with the Facebook Platform, an economist would expect Facebook to have reduced its price, or at least seriously considered doing so, in response to the fact that Apple and Google monetization revenues have increased over the past five years (and Facebook's have decreased). Mot at 18-19; Ex. 7, at 59. However, neither has happened. Ex. 44, at -847, 851; Ex. 15, at 219-20, 230; Ex. 79; Ex. 67.

### 4. Facebook's Arguments in Favor of Including Mobile Platforms Are Invalid.

Facebook superficially argues that mobile platforms should be included in the relevant market for social-game networks because some of the "same" games are available on other platforms and because Facebook provides developers on other platforms access to Facebook's social graph information for "free." Mot. at 1-2, 4-6, 9, 11-12, 30. This is irrelevant and misleading for several reasons.

First, the games are not the "same" from the perspective of a developer, regardless of whether the names or certain features may appear similar to an end user. *See supra* §§ II(K),

III(A)(1)-(2).

Second, the fact that the "same" games appear on Facebook and mobile platforms actually indicates that ***they are in separate markets***, not the same one. Mot. at 2, 3, 12-13. Even Facebook's expert, Dr. Carlton, agrees that just because firms are present on multiple platforms does not mean those platforms are in the same market. *See* Ex. 5, at 324–329; Ex. 116.

Products are in the same market if they "can replace one another and thus 'compete' for the user's purchase." 2B Phillip E. Areeda et al., *Antitrust Law* ¶ 565a (4th ed. 2014); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) ("Competing products are in the same market if they are readily substitutable for one another."). Consumers choose among substitutes; they choose one substitute over the other ones. If the Facebook Platform, Apple iOS, and Google Android were in the same market and substitutes for game developers, there would be no need for developers to publish the allegedly "same" game on all three of those platforms. They would just choose to publish on one of them. But that is not what happens.

Developers must, and do, make independent decisions on whether to develop for Facebook.com, Apple iOS, and/or Google Android. Ex. 21, Ex. A ¶¶ 61-65 (hereinafter "Ex. 21"); Ex. 22, at ¶¶ 153, 200. A developer building a game for Facebook Platform targets users who play on their desktop or laptop computers. *Id.* at ¶¶ 153, 200. In contrast, developers building games on the mobile platforms are targeting users playing on smartphones or tablets. Ex. 21, at ¶ 64.[7] A developer may choose to make games on both Facebook and Google

---

[7]   Moreover, each mobile platform has a separate group of users, and for a developer to publish games to those users, it needs to develop for both, or give up on one set of potential users. Ex. 5, at 319; Ex. 21, at ¶ 64. Thus, Facebook's expert admitted that despite a high degree of overlap between developers that publish games on their respective mobile platforms, ***Google Android and Apple iOS are not substitute game platforms for developers***, but rather they complement

Android/Apple iOS to target different users, or target the same user at a different time of the day/different setting. *See* Ex. 23, at ¶ 58. In that way, mobile platforms are additive to, not substitutes for, social-game networks. In fact, Facebook actually *encourages* developers to build games for both Apple iOS and Google Android, which would make no sense if they were competing substitutes. Ex. 117.

In light of the above evidence, even Facebook's economic expert was forced to admit that Facebook.com and mobile operating systems are not fully substitutable, but rather are only "partial complementary [and] partially substitutable." Ex. 5, at 339, 341. Facebook's internal documents say the same thing. *See, e.g.*, Ex. 53 ("I'd assume much of the mobile gaming is complementary and not necessarily cannibalistic.").

Third, Facebook's repeated assertion that it makes its "social graph available" to developers on other platforms isn't really true. Mot. at 1. In addition to being less effective when used outside of Facebook.com, the social graph information Facebook makes available is also incomplete.[8] For example, Facebook does not permit developers on standalone websites access to a user's Facebook friend lists. *See* Ex. 86. In addition, notifications from developers to users, a popular way for developers to get players to re-engage with a game, do not appear on the mobile versions of the Facebook application. Ex. 118.[9] That leads to a much different developer and

---

each other. *See* Ex. 5, at 319, 331. Yet he relied on nearly identical evidence to opine that each mobile platform is a substitute for Facebook.

[8]   Even today, Apple and Android have been unable to build and standardize the social features of a social-game network. Ex. 9, at 53-54, 56; Ex. 12, at 20.

[9]   The evidence suggests that Facebook provides its social graph information outside of Facebook.com not as a showing of good will, but rather as part of a campaign to ensure that new competitors cannot arise. *See* Ex. 96 ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████"); Ex. 48 (discussing ██████████████████████████ █████████).

user experience. *See* Ex. 18, §§ III.B, III.D. The evidence shows that the gameplay, design, technical, marketing, and business model aspect of games on social networks, discussed above, differentiate it from games on other platforms, and that those differences remain even with Facebook Login/Connect. *See supra* §§ II(K), III(A)(1)-(2).

> **5.     There Is Ample Evidence that the Second Market Is Virtual-Currency Services Provided to Developers on Social-Game Networks.**

Facebook similarly argues that the second, tied product market must also include mobile platforms. Mot. at 11-12. This is based on the mere fact that there are free-to-play games outside of Facebook, particularly on mobile devices, that have in-game monetization features. Mot. at 12-13. But because of the numerous differences between social-game networks and other platforms, discussed above, there is a unique market for the provision of virtual-currency services to that market. Facebook's arguments to the contrary are based on an improper market approach. The question is not whether virtual-currency service providers could provide their services on other platforms, but rather whether developers of games on social networks had options other than Facebook for virtual-currency services. After the Mandate, they did not.

> **(a)     Facebook Looks at the Question Backwards.**

As stated above, markets are defined from the perspective of consumers, not producers. *See supra* at 13. The fact that similar services are provided in a different market is irrelevant. The market is defined here by the options available to the relevant consumers (here, developers publishing games on social-game networks). Ex. 20, at ¶ 109.

Their choice of virtual-currency service providers has been restricted by Facebook. Ex. 109; Ex. 17, at 137, 194-95.[10] Facebook's argument (as well as its purported evidence) is thus

---

[10]   Facebook cites the example of Candy Crush Saga, which has been successful on Facebook and mobile platforms. Mot. at 12-13. Facebook uses this example as proof that developers of

directed to the wrong question – whether *producers* of the product at issue (virtual-currency services) could shift their production from one market (social-game network) to another (other platforms). That is irrelevant. *Intellective, Inc. v. Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 611-12 (S.D.N.Y. 2002) ("The focus is always on . . . the ability of the consumer of that product to choose either a different product or a different supplier for that product. The focus is not, as defendants try to argue, on what any given supplier may be able to produce.").

Moreover, Facebook's argument that social game developers could switch virtual-currency services providers by switching from Facebook to a mobile platform, is similarly unavailing. Mot. at 13-14.[11] This is just an argument on the definition of the first market, social-game networks. As described above, games on social networks are different than mobile games; developers (and Facebook) view social-game networks as distinct from other gaming platforms; and the cost of switching from one platform to another were (and are) substantial. *Supra* at §§ III(A)(1), (3).[12]

Facebook's reliance on *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, for

---

social games can utilize virtual currency services on other platforms. *Id.* However, as Social Ranger's experts made clear, Candy Crush is an outlier, and few games and game genres have been successful across Facebook.com and mobile platforms. Ex. 23, at ¶¶ 5-9; Ex. 19, at ¶¶ 7-11.
[11]   Moreover, as detailed by Social Ranger's economic expert, the separate market for virtual-currency services provided to developers publishing games on social game networks was reinforced by Facebook's anti-steering policies, which prevented developers from encouraging users to purchase virtual currency offsite, and mandated that they could not charge a lower price for virtual currency offered outside of Facebook.com. *See* Ex. 20, at ¶¶ 6, 15, 62, 85-87, 97-98, 106-07, 226-40; Ex. 21, at ¶¶ 2, 13, 32, 44, 46-51, 57-60, 89, 99, 123-130. Facebook's expert has not provided a contrary opinion. Ex. 21, at ¶¶ 49–50.
[12]   Facebook's citation to *Elliot v. United Center*, 126 F.3d 1003 (7th Cir. 1997), is inapposite. Mot. at 16. In reaching its result, the Seventh Circuit in *Elliot* expressly acknowledged the importance of the United Center's lack of market power among entertainment venues in Chicago. *Id.* at 1005 ("[I]t is very doubtful that the United Center has any significant market power" among comparable venues in Chicago area). Here, unlike United Center (one of many venues in Chicago), Facebook indisputably had market power in the social game network market before (and after) the Mandate.

the proposition that Social Ranger's market definition is too narrow is similarly misplaced. 959 F.2d 468, 475 (3d Cir. 1992) (en banc). There, the plaintiff expressly limited the tying market to new Chrysler vehicles rather than new automobiles generally.  959 F.2d at 479. By contrast, Social Ranger alleges the tying market is social game networks generally and the tied market is virtual-currency services offered on those networks. Unlike the defendant in *Town Sound*, Facebook has a monopoly position in the relevant markets, which are properly defined and fully supported as explained above. Social Ranger's market definitions are not limited to Facebook; instead Facebook is the only remaining competitor in the relevant markets.

Finally, a product market can be defined more narrowly when there are efforts to lock-in market participants to the products of one supplier, and market participants have imperfect information and high switching costs. *See Kodak*, 504 U.S. at 476-78; *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 399-400, 404 (3d Cir. 2016). Here, Facebook's Platform announcement in 2007, open platform position, and intentional deception of the market regarding the plans for mandating Credits all served to lock-in developers to Facebook's social-game network, and made it more difficult, and expensive, for them to switch to other game platforms, and other virtual-currency services, than they otherwise would have been able to. Ex. 20, at ¶¶ 67, 194; Ex. 66, at 4. All of this supports Social Ranger's definition of the second product market.

### (b)    Additional Evidence Supports a Market for Virtual-Currency Services on Social-Game Networks

There is significant additional evidence supporting a market for virtual-currency services on social-game networks. This includes:

(1)  Companies providing virtual-currency services for social-game networks were a discrete, unique set of companies, which were identified as such in the industry. Ex. 107; Ex. 40. They leveraged their knowledge of social games networks, as well as their relationships with

payment processors and advertisers,[13]  which made entry by new suppliers difficult. *See* Ex. 13, at 95; Ex. 60, at 30.

(2)  Provision of virtual-currency services for social-game networks is technically and substantively different than for other platforms, and cannot be simply transferred from one to the other. Ex. 23, at ¶¶ 42-44, 142, 146. Moreover, companies like Apple, Microsoft, Steam, and Kongregate have never offered their monetization services outside their own platforms.[14]

Facebook compared itself to companies like Super Rewards.  Ex. 32. And it rejected any suggestion that it competed with Apple, Ex.80-81; Ex. 37, at -585, or with more generalized payment processors like Paypal. Ex. 10, at 58-59, 142; Ex. 31, at 2.[15]

**B.     The Court Should Not Dismiss Social Ranger's Tying Claim.**

"Tying is defined as selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." *Town Sound* , 959 F.2d 468 at 475. Social Ranger has stated a valid tying claim under either the per se rule (which is applicable

---

[13]   Ex. 104, at 3; Ex. 16, at 113, 195-196; Ex. 3, at 113-114; Ex. 107.
[14]   If the 30% revenue share charged by Facebook for Credits was truly comparable with the 30% revenue share charged by Apple, Google, and others in connection with their platforms, Mot. at 9, and reflected a competitive price, there would not be hundreds of Facebook documents questioning whether its 30% fee was supra-competitive. *See, e.g.*, Ex. 89, at 20; Ex. 91, at 38.
[15]   Facebook's arguments on a "cluster market" and the geographic scope of the virtual currency services market, raised only in footnote 13, are unavailing. Extensive evidence demonstrates that consumers on social game networks often demanded both offer advertisements and payment processing services. *See, e.g.*, Ex. 57; Ex. 38, at 23-24; Ex. 27, at -777. In addition, in *United States v. Grinnell Corp.*, the Supreme Court agreed with a cluster market definition where some, but not all, of the suppliers provide the full variety of central service station protective services, and consumers "utilize different services in combination." 384 U.S. 563, 572 n.6, 573 (1966). Regardless, Facebook's conduct targeted the provision of both payment processing and offer advertisement services, so this case does not turn on a "cluster market" definition; Facebook monopolized both types of services whether they comprise one market or two. As to the geographic scope, the evidence shows that the virtual-currency services providers for the social game network market, including Facebook, Super Rewards, and TrialPay, were *all* located in the United States, and there were barriers to providing those services from other countries to the United States. Ex. 21, at ¶ 96 n. 122. Moreover, the Mandate excluded other virtual-currency services providers, regardless of location. *See id.* at ¶¶ 96-97.

here) or the rule of reason.

     **1.**    **Social Ranger Has a Valid Tying Claim Under the Per Se Rule**

     **(a)**    **The Third Circuit's *En Banc* Opinion in *Town Sound* Requires Application of the Per Se Rule**

Under a per se analysis, a tying arrangement is "automatically illegal without further proof of anticompetitive effect" where "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected." *Id.* at 477. There is ample evidence to support the first two elements, and Facebook does not dispute the third.

Facebook argues that *per se* liability is inappropriate here because the court in *United States v. Microsoft Corp.* held that the rule of reason should be used in certain situations. 253 F.3d 34 (D.C. Cir. 2001); Mot. at 29. But this ignores the Third Circuit's unqualified statement in *Town Sound* that it would apply the per se rule to tying claims, "unless and until the Supreme Court decides to do away with it." *Town Sound*, 959 F.2d at 478. The Supreme Court has not done so, and *Town Sound* remains good law. So courts within the Third Circuit "must apply the traditional 'per se' rule" against tying arrangements. *Id.*, 959 F.2d at 478; *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 405 (3d Cir. 2016) ("tying . . . is *per se* illegal").

     **(b)**    **Facebook Tied Access to its Social-Game Network with Purchase of Its Virtual-Currency Services**

It cannot be disputed that Facebook tied developers' access to the Platform (the tying product) to its virtual-currency services (the tied product).[16] Ex. 5, at 163, 165, 200. That is a

---

[16]  Although Facebook suggests that it "integrated" its virtual currency services into its social game network, *see infra* § III(C)(2)(b), Facebook does not actually dispute that the Platform and virtual currency services are separate products. Regardless, the facts show that they are separate products. Facebook did not even offer virtual currency services for the first years of its Platform, while a separate industry of virtual currency service providers (which did not offer social game

classic tying arrangement, which must be analyzed under the per se rule. *Ungar v. Dunkin'*

*Donuts of Am., Inc.*, 531 F.2d 1211, 1224 (3d Cir. 1976) ("[W]ith respect to the [tie-in] element,

a formal agreement is not necessary, although it is sufficient.").[17]

### (c)     Facebook Had Market Power in the Social-Game Network Market

Courts will find market power where "the defendant's share of the market is so high that

it occupies a dominant market position." *Town Sound*, 959 F.2d at 479. A "dominant market

position" is a lesser standard than showing monopoly power. *Kodak*, 504 U.S. at 481. Facebook

had at least a 73% market share in the social-game network market, measured by the number of

users of social networking services, at the time of its Mandate, and has a 100% market share

today. Ex. 20, ¶¶ 180, 182, Ex. 4. On its face, a market share this large is sufficient to survive

summary judgement, especially under the lesser "market power" standard. *See Kodak*, 504 U.S.

at 481 ("evidence that Kodak controls nearly 100% of the parts market and 80% to 95% of the

service market, with no readily available substitutes, is, however, sufficient to survive summary

judgment under the more stringent monopoly standard of § 2."). ***Even under Facebook's market***

***definition***, which includes mobile platforms, Facebook's share of the market at the time it

instituted its anticompetitive policies ***was nearly 80%***. Mot. Ex. 1 (Carlton Report) ¶ 76, Table 1;

Ex. 20, ¶ 183. There can be no question that Facebook had market power in the social-game

network market at the time of the Mandate. It no longer had any viable competitors, and it knew

---

network services) served developers. Facebook itself recognized virtual currency services as a
second line of business. Ex. 20, at ¶ 65; Ex. 26.

[17]   Facebook argues (at 31) that developers were not coerced into using Facebook's virtual-
currency services. But as explained above, Facebook had market power over the tying product
(its social-game network) and expressly conditioned the use of the tying product on the use of the
tied product (its virtual-currency services). That constitutes "coercion" or "forcing." *See, e.g.*,
*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12-14 (1984). In addition, as explained
on page 8, Facebook itself recognized it was forcing developers into using Facebook Credits.

that it would be able to force developers to use Credits. *See supra* at § II(G)(2) & n.2.

### 2. Facebook's Tying Arrangement Also Violated the Rule of Reason

Even if Social Ranger cannot show market power in the tying product market, it can also succeed on its Section 1 tying claim under the rule of reason. *Town Sound*, 959 F.2d at 482. As set forth below, Facebook has not met its burden of showing that there are no factual disputes on the anti-competitive effects of its conduct in the tied product market (the market for virtual-currency services). *See* Mot. at 32; *infra* at §§ III(C).

Moreover, Facebook's statements to the public that developers could keep all their revenue, and its lock-in of developers, aided by Facebook's false statements regarding its intentions concerning Credits (*see supra* at §§ II(B), II(E), II(G)(3)), alone creates a triable issue of fact regarding market power and harm to competition in the second product market. Ex. 20, at ¶¶ 67, 69, 71-72, 185-89, 194; *see Kodak*, 504 U.S. at 476-78; *Avaya*, 838 F.3d at 399-400, 404.

### C. The Court Should Not Dismiss Social Ranger's Monopolization Claim

#### 1. Facebook Monopolized the Market for Virtual-Currency Services on Social-Game Networks

Social Ranger's monopolization claim comes largely down to the definition of the relevant market.[18] If there is a valid market for virtual-currency services provided to developers on social-game networks, as Social Ranger defines that market, then it cannot be disputed that Facebook attained a monopoly through the Mandate. Ex. 20, ¶¶ 150, 205. As described below, Facebook's technical arguments to the contrary are unavailing.

##### (a) There Are Numerous Factual Issues Regarding the Durability of Facebook's Monopoly and Barriers to Entry

Facebook first argues that there is no evidence "that Facebook had any durable market

---

[18]   Tying can support a claim for monopolization or attempted monopolization. *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 397 (3d Cir. 2016).

power or that there are high barriers to entry in the virtual-currency services market." Mot. at 17. However, like market definition, "durability involves a fact question for the jury." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1124 (10th Cir. 2014). Facebook's argument is based on its assertion that it accounted for 80% of all in-game transactions on Facebook and mobile platforms in 2011, which fell to 33% two years later. Mot. at 17-18. But that is beside the point for a few reasons.

First, Facebook's argument is based on the definition of the relevant markets. If Social Ranger's market definitions prevails, then Facebook had nearly 73% market share in 2011 measured by the number of users of social networking services, and 100% today. *Supra* at § II(G)(2); Ex. 20, ¶¶180, 182, Ex. 4.[19]

Second, even under Facebook's broader market definition, Facebook's market share was still far in excess of 85% two years after the Mandate, and over 50% after three years. Ex. 21, ¶ 77 & Ex. 1. The Department of Justice and Facebook's own expert have explained that two years would be a "significant [amount of] time" for prices to be profitably increased by a purported monopolist. Dennis W. Carlton, *Market Definition: Use and Abuse*, COMPETITION POL'Y INT'L, Spring 2007, at 2, 14 (Ex. 119); U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 3.2 (1997).

Third, none of the cases cited by Facebook hold that a decrease in market share alone precludes a finding that market power was durable. Courts look to a multitude of other factors, such as "barriers to entry, the elasticity of demand, [and] the nature of defendant's conduct." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998); *Mylan Pharm. Inc. v.*

---

[19]   Notably, none of Facebook's cited cases involved a disputed market definition at the summary judgment stage. Mot. at 18-19.

*Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 437 n.72 (3d Cir. 2016). Even if Facebook's

market definitions are accepted as a matter of law, the mere fact that its market share later

decreased does not justify summary judgment in its favor.

As to barriers to entry, such discussion is entirely theoretical. In reality, Facebook has

prohibited competing virtual-currency services providers altogether. *See* Ex. 109; Ex. 17, at 137,

194-195. Regardless, there is extensive evidence that existing virtual-currency services providers

enjoyed numerous competitive advantages making entry by potential new suppliers difficult.

*Supra* at § III(C)(5)(b) .

### (b)     There Is Ample Direct Evidence of Facebook's Monopoly Power.

Facebook next briefly makes the remarkable argument that there is no direct evidence of

monopoly power. Mot. at 19. But Facebook entirely excluded competing virtual-currency

services providers from selling services to developers on social-game networks.[20] And regardless

of market definition, Facebook is wrong. There is direct evidence of Facebook's monopoly

power because it successfully implemented its Mandate, harmed competition by restricting

developer choice, raised prices, decreased quality, and decreased developer incentives to build

new games. Ex. 20, ¶¶ 111-30; Ex. 5, at 214; *see also supra* at §§ II(F), I. [21]

### 2.     There Is Ample Evidence that Facebook Engaged in Improper Conduct

---

[20]   At n. 15, Facebook cites *Queen City Pizza* to argue that a contractual agreement cannot
support a showing of market power.  In that case, the consumer had choices of franchisors to
work with, but voluntarily entered into an agreement to restrict its ability to purchase supplies
from others.  124 F.3d at 435.  Here, developers did not have a choice, and were forced to agree
to Facebook's terms to use a separate product.

[21]   At n. 18, Facebook contends that it did not realize supra-competitive margins or reduce
output. That is inconsistent with the record. Facebook's post-conduct margin (over ▮▮▮▮ based on
total payment volume, Ex. 56), far exceeds the margins of Super Rewards, *see* Ex. 121, whom
Facebook saw as a market leader. In addition, output in the virtual-currency services market
would have increased more without Facebook's policies.  Ex. 7, at 59, 176-177; Ex. 20, at ¶ 15;
Ex. 5, at 29-30, 60, 114.

**(a)      Facebook's Policies Cannot be Fairly Characterized as a Charge for Distribution**

Facebook first asserts that its conduct should be viewed as a charge for developers' use of its Platform. Mot. at 21, 22. Facebook's own documents demonstrate that the 30% revenue share is a price for a separate product – virtual-currency services. *See, e.g.*, Ex. 29 ███████████

████████████████████████████████████████████████████████████████

█████████████ (emphasis added); Ex. 109; Ex. 49.

Facebook's reference to its 2007 Developer Terms of Service ("2007 TOS"), Mot. at 21 is similarly misleading. It is true that in the 2007 TOS, Facebook "reserve[d] the right to charge a fee for using the Facebook Platform and/or any individual features thereof." Ex. 84 at -969. However, the 30% fee was not for using the Platform or a feature thereof, as Facebook Credits was always treated as a separate product.[22] Regardless, in early 2009, the 2007 TOS was withdrawn and the provision Facebook relies on as providing a grounds to charge developers ***was removed***. Ex. 108; Ex. 64.[23]

Moreover, courts have explained that there is a material difference between (a) raising the price of a first product and (b) increasing profits by tying the first product to a second product thereby harming competition in the second product market. *Jefferson Parish Hosp. Dist. No. 2 v.*

---

[22]   Even if Credits were a "feature," the 2007 TOS provide that "[i]f we do charge a fee for . . . any feature [of the Facebook Platform] you do not have any obligation to continue to use . . . the applicable feature." Ex. 84, at -969. Facebook never gave developers that choice .
[23]   Facebook cites *Race Tires* for the proposition that there is no antitrust injury resulting from exclusive contracts awarded by sanctioning bodies to tire suppliers, where there was competition among those suppliers for those contracts from different sanctioning bodies. 614 F.3d at 83. In this case, however, there is no competition for exclusive contracts from different social-game networks. Facebook is the only one remaining. Exs. 54, 112; Ex. 124 at 111, 150.  Moreover, in reaching its conclusion, the Court found that sports sanctioning bodies, unlike Facebook here, deserve a "degree of deference and freedom to act." 614 F.3d at 80. Even then, they are required to show they were "actually promoting a pro-competitive or legitimate business justification," and that they were doing so in "good faith." *Race Tires*, 614 F.3d at 81, 83.

- 28 -

*Hyde*, 466 U.S. 2, 14-15 (1984) ("[T]he law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other."); *Kodak*, 504 U.S. at 463 n.8, 488. Facebook did the latter. *Supra* at III(B).[24]

      **(b)**       **The Mandate Cannot be Fairly Characterized as "Vertically Integrat[ing] Payment Processing Into Its Core Platform Services"**

Facebook next argues that its conduct can be viewed as simple "vertical integration." Mot. at 23. Requiring your customers to buy a separate, but related, product, *is not* vertical integration, but rather is tying.[25] *See Kodak*, 504 U.S. at 463 ("We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." (quotations omitted)); *see also Int'l Bus. Machs. Corp. v. United States*, 298 U.S. 131, 132 (1936). To hold otherwise would excuse all product ties in related markets as "vertical integration" because a defendant in any tying case would be permitted to argue that it was merely "vertically integrating" into manufacturing the tied product. That is not the law.

      **(c)**       **There Is Extensive Evidence that Facebook's Mandate Was Not Motivated by Concerns over the Quality of User Experience**

      **Facebook Is Wrong About the Applicable Standard**. Facebook presumes that by advancing procompetitive justifications, it is entitled to summary judgment. But that is not the law. Instead, the defendant carries a burden to show its proffered justifications are not pretextual.

---

[24]  Facebook's argument in footnote 21, that Plaintiff has no right to sell its services on Facebook's website, ignores the more factually similar cases that have explicitly rejected claims based on unsupported notions of "free-riding." *See Kodak*, 504 U.S. at 485 ("[A]ccording to Kodak, the ISO's are free-riding because they have failed to enter the equipment and parts market.  This understanding of free-riding has no support in our case law.").

[25]  The cases Facebook cites for the unremarkable proposition that "vertical integration *alone* does not violate Section 2" are irrelevant, given that the facts here involve conduct that is legally more than "vertical integration alone."  Mot. at 24 (emphasis added).

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co*, 838 F.3d 421, 438 (3d Cir. 2016); s*ee also*

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 81 (3d Cir. 2010) (defendant

must show "good faith, sufficient pro-competitive or business justifications for their actions").

Facebook also has the burden to show its procompetitive justification was the least restrictive

means for a achieving its objective. *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 308 (3d

Cir. 2007). Facebook has not even attempted to meet these burdens.

Courts assess defendants' proffered justifications and do not credit allegedly pretextual

explanations, leaving it to the jury to determine their credibility. *See Kodak*, 504 U.S. at 484

(agreeing with the Court of Appeals that respondents "have presented evidence from which a

reasonable trier of fact could conclude that Kodak's first reason is pretextual.") When a

defendant proffers "nonpretextual procompetitive justifications for its conduct," the plaintiff may

"rebut those justifications." *Mylan*, 838 F.3d at 438 (internal quotations omitted).

Finally, Facebook cites to *Novell, Inc. v. Microsoft Corp.* for the mistaken proposition

that Social Ranger must prove Facebook could not have had a legitimate justification for its

conduct—i.e., that its "conduct [was] irrational but for its anticompetitive effect." 731 F.3d 1064,

1075 (10th Cir. 2013). But the quoted language relates to the refusal-to-deal doctrine and is not

applicable here.[26] *Compare id.* with *Mylan*, 838 F.3d at 438; *see also Kodak*, 504 U.S. at 463 n.8

(distinguishing tying from refusal-to-deal).

**The Relevant Facts Are Highly Disputed**. Facebook's justifications are based on its

assertion that it wished to "improve the payment experience for its users" and address "poor user

experiences." Mot. at 24. But the evidence is to the contrary in at least five ways.

First, as discussed *supra* at § II(E), Facebook considered monopolizing the virtual-

---

[26]  The cases Facebook cites at n.21 can be distinguished on the same grounds.

currency services market as early as 2008. By the beginning of October 2009, Facebook had developed its concrete Plan to follow through on its desire to monopolize the market. *Supra* at § II(G). It was not until nearly a month later that the alleged "Scamville" article was published. Mot. at Ex. 16. But Facebook uses this fleeting incident now as a justification for its Plan, which was hatched before allegedly issues with advertising came to Facebook's attention.[27]

Second, Facebook claims it intended to "[e]nable frictionless payments and consistent payment flow." Mot. at 25. But Facebook's virtual-currency services increased payment friction. At the time it instituted its July 2011 policies, developers were forced to use a payment flow that Facebook employees knew was ████████████████ and ████████████████████ ██████  *See supra* § II(H)(2). This payment flow did not "improve the payment experience," as Facebook suggests. Mot. at 24-25; Ex. 63, at -496-497.

Third, Facebook's claims it intended to address "privacy concerns." Mot. at 25. But Facebook cites no evidence that Facebook had privacy concerns related to virtual-currency providers or that Facebook sought to address those concerns. *Id.*

Fourth, Facebook claims the Mandate helps it to address customer complaints. Mot. at 25. But Facebook again cites no evidence other than hearsay that customers complained or were confused. Mot. at 7. Facebook also provides no evidence that it ever provided "better 'customer' support" than competing virtual-currency services like Super Rewards. Mot. at 8. In fact, Facebook Credits was criticized for its poor customer support. Ex. 63, at -497; Ex. 50.

Fifth, Facebook asserts it wanted to "recover its investment in the Platform." Mot. at 23. But "whatever is good for [Facebook] is not necessarily permissible under § 2 of the Sherman

---

[27]  If Facebook had legitimate concerns about the existing virtual currency services providers, it would not have referred developers to them and described them, including Super Rewards, as "trustworthy." Ex. 78; Ex. 39.

Act." *LePage's Inc. v. 3M*, 324 F.3d 141, 163 (3d Cir. 2003). Instead, a valid justification must "relate[] directly or indirectly to the enhancement of consumer welfare," which is not present here. *Id.* (quotations omitted ). Moreover, Facebook was already recovering its investment through hundreds of millions of dollars of advertising revenue, and increased engagement on Facebook.com. *See supra* at § II(D).

Finally, Facebook's justification for forcing social game developers to use TrialPay—that it can control for improper ads—is also disputed. Mot. at 26-28. No evidence exists that TrialPay's ads are better than Super Rewards' ads were. Nor does Facebook have evidence to support its justification that it contracted with TrialPay to limit the number of ads it had to monitor. Mot. at 27-28. In fact, Facebook monitored all offer ads before and after the Mandate. Ex. 2, at 130.[28]

### (d)  There Are Other Relevant Factual Disputes

Even if the facts about Facebook's proffered pro-competitive justifications were not disputed, if outweighed by anti-competitive effects then Facebook's conduct still violates the antitrust laws. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007). Facebook's expert admitted that goals like frictionless payments could have been achieved if Facebook created an online computer system to store credentials, keeping consumer choice intact by allowing third party payment options. Ex. 41, at 5; Ex. 5, at 109-111. Similarly, because Facebook already did "[m]onitor all offer ads," Facebook could have used an ad-approval engine to ensure compliance with Facebook's policies, while allowing developers to monetize their apps as they wished. Ex. 2, at 130:2-10. Super Rewards even offered to pay for a Facebook employee

---

[28]  Facebook's contention that the TrialPay deal is nonexclusive does not match the evidence. Facebook may have been permitted by its agreement with TrialPay to contract with other ad providers, but developers are forced to work exclusively with Facebook. Ex. 5, at 135.

to conduct such a review. Ex. 75. And Facebook could have continued with its "whitelist" of "trustworthy" monetization providers, which included Super Rewards, as it did for over a year before the Mandate. Ex. 78, at 2; *see also* Ex. 39.

Dr. Frankel considered Facebook's proffered justifications to determine whether procompetitive justifications outweigh anticompetitive effects. Ex. 20, at ¶ 267; Ex. 21, at ¶ 99. Dr. Frankel explained that whatever benefit Facebook's supposed justifications provided was outweighed by significant anticompetitive effects. Ex. 20, at ¶¶ 128-30; *see also id.* ¶¶ 99-127. Facebook has offered no expert opinion to rebut that conclusion, Ex. 5, at 144-146, and thus Facebook's supposed procompetitive justifications remain in dispute.

**D.    The Court Should Not Dismiss Social Ranger's Attempted Monopolization Claim**

Facebook contends Social Ranger's attempted monopolization claim should be dismissed because it has not shown that Facebook had a "dangerous probability of successfully monopolizing the relevant market." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992). Again, this comes down to the definition of the relevant markets. Facebook obtained a 100% market share in the virtual-currency services market by foreclosing competition through its Mandate. Tellingly, even under Facebook's proposed market definitions (including mobile), it had a 79.8% market share at the time of the Mandate. Mot. Ex. 1, Carlton Report Table 1.[29]

Further, Facebook knew its Plan would succeed and that developers had no choice but to accept using Credits. *See* Ex. 95; Ex. 37, at -79, 83 ██████████████████████████ ███████████████████████████████████████ Ex. 42, at 4.

**E.    Social Ranger Has Demonstrated the Anticompetitive Effects of Facebook's Challenged Conduct**

___

[29]   Dangerous probability of success is measured from the time of the anticompetitive conduct. *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007).

Facebook finally argues that to state a valid antitrust claim, Social Ranger must prove there was harm to game users from the challenged Facebook policies (in addition to developers) because the Platform is a "two-sided market." Facebook's citation to the Second Circuit's decision in *United States v. American Express Co.*, 838 F.3d 179 (2d Cir. 2016) ("*Amex*") to support this proposition is misplaced. In *Amex*, this meant that plaintiff had to show that harm to merchants was not exceeded by benefits to credit card users. *Id.* at 205.

*Amex*'s requirement that a plaintiff demonstrate anticompetitive effects after netting any benefits from the challenged conduct to another group of customers on another side of the alleged "marketplace" is inconsistent with controlling precedent. *See supra* § III(C)(2)(c). In addition, in *Times-Picayune Publishing Co. v. United States*, the Court held that a proper analysis need only focus on one "side" of the "marketplace" (in that case, the advertising market and not the reader market). 345 U.S. 594, 610 (1953).[30]

Even if Facebook's view of the law were correct, there is significant evidence that game users (in addition to developers) experienced harm. Game users suffered harm in reduced choice, reduced quality, and increased price. *Supra* at § II(I). The *Amex* court noted that such types of evidence would have been sufficient to satisfy plaintiffs' initial burden at trial. *Amex*, 838 F.3d at 205-06. Dr. Frankel also analyzed Facebook's challenged policies from a two-sided perspective and found that on net there was harm even on that basis. Ex. 20, § 6.5.

---

[30] Facebook's argument that Social Ranger must prove the anticompetitive effects borne by game users is also flawed because (a) Social Ranger's tying claim must be analyzed under the *per* se rule (under which *Amex* is irrelevant), as discussed above; (b) even if it is not, the Third Circuit has made clear that it is Facebook's burden to come forward with procompetitive justifications. *Mylan*, 838 F.3d at 438; *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367-68 (3d Cir. 1996); (c) aside from conclusory statements from its employees, Facebook has no evidence of user benefits from its conduct; and (d) its economic expert has done no balancing (whether with respect to users or otherwise). Ex. 5, at 144-146.

Finally, there can be no real dispute that developers were harmed. When a company

eliminates **all** competition in a relevant market, as Facebook did here, plaintiff has clearly

adduced evidence of anticompetitive effects in the tied product market.[31] Ex. 20, § 5.[32] In

addition, Social Ranger's expert, Dr. Frankel, analyzed the result of Facebook's price increase

and concluded that developers "had an economic incentive to develop fewer games." Ex. 20, at

¶¶ 264-65. Facebook's expert agreed. Ex. 5, at 114-15.

**F.      Facebook's Motion Relies on Inadmissible Evidence or Incomplete Argument**

Facebook's motion depends extensively, and often exclusively, on the opinions of its

experts. Because these opinions were not sworn to under the penalty of perjury, they are

inadmissible on summary judgment and should be disregarded. *Fowle v. C & C Cola, a Div. of

ITT-Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989); *Phillis v. Harrisburg Sch. Dist.*, 430 F.

App'x 118, 122 (3d Cir. 2011); *Burrell v. Minn. Mining Mfg. Co.*, 2011 WL 5458324, at *1 n.1

(E.D. Pa. June 9, 2011). In addition, Facebook's motion relegates several independent arguments

entirely to footnotes. These should be ignored. *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*,

119 F.3d 1070, 1076 n.6 (3d Cir. 1997); *see also UCB, Inc. v. Accord Healthcare, Inc.*, 2016 WL

4376346, at *48 n.36 (D. Del. Aug. 15, 2016) (same).

<u>Conclusion</u>

Social Ranger respectfully requests that the Court deny Facebook's motion.

---

[31]   The harm to Super Rewards was thus not merely "indirect" and "duplicative." Mot. at n. 33. Facebook's Mandate expressly forced Platform developers to use Credits, and prohibited them from purchasing the Super Rewards, or any other, competitive virtual-currency service. Facebook also argues (at 33-34) that competition was not harmed in the market as a whole, and that only certain competitors were harmed. But as explained above, Facebook excluded all competitors in the virtual-currency services market, not just certain competitors.
[32]   At pp. 33-34, Facebook recycles its earlier arguments on vertical integration and harm to competition in the tied product market. As noted, Facebook's conduct was not mere vertical integration, and it eliminated **all** competition in the virtual-currency services market.

Dated: February 8, 2017                By:   /s/ Kenneth L. Dorsney
                                           Kenneth L. Dorsney (I.D. #3726)
Mary B. Matterer (I.D. #2696)
**Morris James LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com
mmatterer@morrisjames.com

Derek A. Newman (*pro hac vice*)
Derek Linke (*pro hac vice*)
Jason Sykes (*pro hac vice*)
**Newman Du Wors LLP**
2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800
dn@newmanlaw.com
linke@newmanlaw.com
jason@newmanlaw.com

Brian R. Strange (*pro hac vice*)
Keith L. Butler (*pro hac vice*)
Cindy Z. Reichline (*pro hac vice*)
**Strange & Butler**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
bstrange@strangeandbutler.com
kbutler@strangeandbutler.com
creichline@strangeandbutler.com

Bruce Van Dalsem (*pro hac vice*)
Harold A. Barza (*pro hac vice*)
Kevin Teruya (*pro hac vice*)
Michael Lifrak (*pro hac vice*)
David Elihu (*pro hac vice*)
Alyssa L. Greenberg (*pro hac vice*)
**Quinn Emanuel Urquhart & Sullivan, LLP**
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
brucevandalsem@quinnemanuel.com
halbarza@quinnemanuel.com
kevinteruya@quinnemanuel.com
michaellifrak@quinnemanuel.com

davidelihu@quinnemanuel.com
alygreenberg@quinnemanuel.com

**ATTORNEYS FOR PLAINTIFF**
**SOCIAL RANGER, LLC**