**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SOCIAL RANGER, LLC, a Delaware limited liability company,<br><br>*Plaintiff*,<br><br>v.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>*Defendant*. | **C.A. NO. 14-1525-LPS**<br><br>[redacted]<br><br>**PUBLIC - REDACTED VERSION** |

# PLAINTIFF SOCIAL RANGER, LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO PRECLUDE FACEBOOK, INC.'S EXPERT MARK ISRAEL FROM PROVIDING TESTIMONY AT TRIAL


Kenneth L. Dorsney (I.D. #3726)
**Morris James LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com

Derek A. Newman (*pro hac vice*)
Derek Linke (*pro hac vice*)
Jason Sykes (*pro hac vice*)
**Newman Du Wors LLP**
2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800
dn@newmanlaw.com
linke@newmanlaw.com
jason@newmanlaw.com

**ATTORNEYS FOR PLAINTIFF SOCIAL RANGER, LLC**


Dated: March 24, 2017


Brian R. Strange (*pro hac vice*)
Keith L. Butler (*pro hac vice*)
Cindy Z. Reichline (*pro hac vice*)
**Strange & Butler**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
bstrange@strangeandbutler.com
kbutler@strangeandbutler.com
creichline@strangeandbutler.com

Bruce Van Dalsem (*pro hac vice*)
Harold A. Barza (*pro hac vice*)
Kevin Teruya (*pro hac vice*)
Michael Lifrak (*pro hac vice*)
David Elihu (*pro hac vice*)
Alyssa L. Greenberg (*pro hac vice*)
**Quinn Emanuel Urquhart & Sullivan, LLP**
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
brucevandalsem@quinnemanuel.com
halbarza@quinnemanuel.com
kevinteruya@quinnemanuel.com
michaellifrak@quinnemanuel.com
davidelihu@quinnemanuel.com
alygreenberg@quinnemanuel.com

# TABLE OF CONTENTS

**Page**


I. NATURE AND STAGE OF THE PROCEEDINGS ....................1

II. SUMMARY OF THE ARGUMENT ....................1

III. SUMMARY OF RELEVANT FACTS ....................2

- A. Dr. Leitzinger's Damages Calculation. ....................2
- B. Dr. Israel's Damages Calculation. ....................3
- C. Dr. Israel's "Zero Economic Profits" Opinion. ....................4
- D. Dr. Israel's "Self-Inflicted Damages" Opinion. ....................5

IV. ARGUMENT ....................5

- A. Dr. Israel's Damages Calculation Should Be Excluded. ....................6
  - 1. Dr. Israel's Use of an Incorrect Margin Makes His Calculation Unreliable. ....................6
  - 2. Dr. Israel's Use of Social Ranger's Market Share After the Challenged Conduct Makes His Calculation Unreliable. ....................7
- B. Dr. Israel's "Zero Economic Profits" Opinion Should Be Excluded. ....................8
- C. Dr. Israel's "Self-Inflicted Damages" Opinion Should Be Excluded. ....................9

V. CONCLUSION ....................10

# TABLE OF AUTHORITIES

**Page**

## Cases

*All Pro Maids, Inc. v. Layton*, No. Civ.A. 058-N,
2004 WL 1878784 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005)........................7

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003)........................5

*In re: Chocolate Confectionary Antitrust Litig.*,
No. 08-MDL-1935, 2013 WL 11305184 (M.D. Pa. May 10, 2013) ........................5

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)........................5

*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*,
213 F.3d 198 (5th Cir. 2000) ........................6

*Heller v. Shaw Indus., Inc.*,
167 F.3d 146 (3d Cir. 1999)........................5

*In re Mushroom Direct Purchaser Antitrust Litig.*,
No. 06-0620, 2015 WL 5775600 (E.D. Pa. Aug. 5, 2015) ........................7

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)........................10

*Prusky v. ReliaStar Life Ins. Co.*,
532 F.3d 252 (3d Cir. 2008)........................10

*R.F.M.A.S., Inc. v. So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010)........................7

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
41 F.3d 1570 (2d Cir. 1994)........................7

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)........................5

## Rules

Federal Rule of Evidence 702........................5

## I. NATURE AND STAGE OF THE PROCEEDINGS

On December 22, 2016, the Court entered a scheduling order (D.I. 219) providing for a March 24, 2017 deadline for objections to expert testimony. Plaintiff Social Ranger now moves to exclude the testimony of Facebook's damages expert, Dr. Mark Israel. The pretrial conference is scheduled for May 26, 2017. Trial will begin June 12, 2017.

## II. SUMMARY OF THE ARGUMENT

Super Rewards is the predecessor to Social Ranger. Facebook engaged Dr. Mark Israel as an expert to measure Social Ranger's damages based upon Social Rangers' lost profits in the "but-for" world, which is the world that would exist but-for Facebook's challenged conduct. Dr. Israel's opinion is unreliable and does not fit the facts of this case.

First, Dr. Israel disregards Super Rewards' historical profit margin. Instead, he uses two alternatives: (a) a 2009 guess of future performance forecasted by a Super Rewards' investor in a PowerPoint presentation; and (b) the profit margin of PayPal. The investor's forecast proved unreliable, as Super Rewards' actual profit margins vastly exceeded the estimate. And PayPal's margin cannot be a proxy for Super Rewards because the two companies do not compete for the same business.

Second, rather than apply Super Rewards' market share before Facebook's conduct, Dr. Israel applies a market share which was cut in half after Facebook's anticompetitive policies were imposed. He then asserts that Super Rewards' estimated market share should be cut in half again, based on an unfounded assumption that most game developers would begin providing virtual-currency services in-house. There is no factual or legal support for any of this.

Third, Dr. Israel intends to testify at trial that, regardless of Facebook's conduct, Super Rewards would not have achieved more than "zero economic profits." This is based on the radical notion that no company in a competitive market could earn "economic profits" and that

lost profits in a case like this is limited to a company's initial investment plus a risk-free interest rate. But as Dr. Israel admitted in deposition, Super Rewards had many of the characteristics of a company that could earn economic profits.

Finally, Dr. Israel opines that Super Rewards' damages were "self-inflicted" because it failed to diversify into other markets after the challenged conduct. But that opinion is irrelevant to measuring the profits Super Rewards would have made if Facebook had not engaged in the challenged conduct. Dr. Israel should not be permitted to pollute the trial with an irrelevant opinion that Super Rewards did not perform well in other markets, with other products.

## III. SUMMARY OF RELEVANT FACTS

### A. Dr. Leitzinger's Damages Calculation.

Social Ranger's expert, Dr. Jeffrey Leitzinger, calculates Super Rewards' share of virtual-currency revenue from gaming on the Facebook Platform in the first two quarters of 2010 (immediately prior to the challenged conduct) as 22.5%. (Ex. 1 ¶ 66).[1] Dr. Israel does not dispute this calculation. (Ex. 2, at 374:10-21) ("I don't dispute the calculation.").

Dr. Leitzinger then calculates the actual virtual-currency payment processing and offer advertising volumes generated from gaming on the Facebook Platform during the damages period. (Ex. 1 ¶ 66). Dr. Israel does not dispute this calculation either. (Ex. 2, at 354:8-15). Dr. Leitzinger removes from his calculations the revenues of the only three developers who performed some services in-house. (Ex. 1 ¶ 66). This results in a total revenue for third-party virtual-currency services during the damages period. (*Id.* at ¶ 67). Dr. Israel does not dispute this calculation. (Ex. 2, at 377:3-6).

[1] "Ex. _" refers to the exhibits attached to the accompanying Declaration of David Elihu in Support of Plaintiff Social Ranger, LLC's Motion to Preclude Facebook, Inc.'s Expert Mark Israel from Providing Testimony at Trial.

Dr. Leitzinger next determined that Super Rewards' operating profit margin from the second quarter of 2010 (immediately prior to the challenged conduct) was 9.9%. (Ex. 1 ¶ 69). Dr. Israel does not dispute this figure. (Ex. 2, at 416:11-16).

Dr. Leitzinger then calculates discount rates for revenue earned through the date of trial and after the date of trial. (Ex. 1 ¶¶ 71-72). Dr. Israel believes both of those discount rates are appropriate. (Ex. 2, at 349:6-351:17).

**B. Dr. Israel's Damages Calculation.**

Dr. Israel adjusted two of Dr. Leitzinger's damages components: market share and profit margin. (Ex. 3 ¶¶ 76-83; Ex. 2, at 395:10-17). Specifically, Dr. Israel uses Super Rewards' market share in the second quarter of 2011, well after Facebook began its challenged conduct and harm to Super Rewards. (Ex. 3 ¶¶ 80-81; Ex. 2, at 396:22-397:8). He then uses this infected market share throughout the damages period. (Ex. 2, at 396:22-397:8). This change cuts the assumed market share in half. (Ex. 3 ¶ 80; Ex. 2, at 404:2-8). As an alternative market share estimate, Dr. Israel takes Super Rewards' market share in the second quarter of 2011 and reduces it by another 52%, assuming without evidence that customers would have replaced Super Rewards and its competition with in-house services. (Ex. 3 ¶¶ 81-82; Ex. 2, at 406:7-408:19).

Dr. Israel uses two alternative profit margins to calculate damages: (a) a presentation from a Super Rewards investor, TCV, forecasting in a 2009 report what Super Rewards' profit margins might be in 2011; or (b) the estimated profit margin of PayPal. (Ex. 3 ¶ 82; Ex. 2, at 408:21-409:3). This reduces Super Rewards profit margin from what it actually achieved (9.9%) to either 4% (TCV forecast) or 3.73% (PayPal). (Ex. 3 ¶ 82).

Based on these adjustments, Dr. Israel calculates Super Rewards' lost profits to be between [redacted] (using his lowest market share and margin numbers) and [redacted]

(using his higher market share and margin options). (*Id.* at ¶ 83; *see also* Ex. 4; Ex. 2, at 420:2-16) (outlining differences between experts' approaches, adopted by Dr. Israel)).

**C. Dr. Israel's "Zero Economic Profits" Opinion.**

Dr. Israel also postulates that given the competitive market for virtual-currency services, Super Rewards would not be able to earn more than "zero economic profits" in the long term. He defines "zero economic profits" as equivalent to providing a "return on [its] capital investments and no more," which he calls its weighted average cost of capital ("WACC"). (Ex. 3 ¶ 13-16; Ex. 2, at 210:9-19). Indeed, Dr. Israel opines that *no firm* could ever earn more than "zero economic profits" in this industry. (Ex. 2, at 213:10-14, 214:4-12) .

Dr. Israel does not analyze actual profits. Instead, he takes the [redacted] that Adknowledge paid for Super Rewards in 2009 and applies a risk-free interest rate to that amount through the date of trial. That produces a calculation of [redacted], which represents a "cap" on damages. (Ex. 3 ¶¶ 48-49; Ex. 2, at 326:21-329:20).[2] He uses this "zero lost profits" logic to defend his calculation of damages between [redacted] and [redacted]. (Ex. 3 ¶ 11).

Dr. Israel further opines that in a competitive industry such as virtual-currency services for social-game networks, a "lost profits" calculation would always "be limited to investments in the company plus interest." (Ex. 2, at 331:13-333:22).

[2] To reach this number, Dr. Israel assumes that Super Rewards could earn no more than its WACC (which exceeded 25%) on the [redacted] investment starting in 2009. Then, to discount those amounts back to their value as of 2009, he uses Super Rewards' WACC as the discount rate, which brings the "lost profits" back to [redacted] again. (*See* Ex. 2, at 323:7-324:4). Therefore, Dr. Israel simply takes the [redacted] and applies a risk-free interest rate to reflect the "time value of money," which gets to his [redacted] estimate. (Ex. 3 ¶¶ 48-49; Ex. 2, at 326:21-329:20, 338:5-11).

**D. Dr. Israel's "Self-Inflicted Damages" Opinion.**

Finally, Dr. Israel opines that Super Rewards' damages were "self-inflicted." (Ex. 3 ¶ 84). He opines that the "gap between profits in the but-for world and profits in the actual world" was due to "poor strategic decisions by Super Rewards" and that "Super Rewards' business failed for a variety of reasons unrelated to the Facebook challenged conduct." (*Id.* ¶¶ 84-87, 88-92). Dr. Israel does not perform any computation as to what portion of Super Rewards' lost profits are due to these alleged "self-inflicted" sources as opposed to Facebook's conduct. (Ex. 2, at 127:1-129:6, 134:19-20) ("I have not given a specific quantified number."). Dr. Israel admitted that his opinions relate to decisions that Super Rewards made after the challenged conduct. (*See id.* at 133:17-22; 154:8-22).

## IV. ARGUMENT

Federal Rule of Evidence 702 "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012); *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). Dr. Israel has never previously testified in court or deposition, or even submitted an expert report, regarding a lost profits calculation. (Ex. 2, at 25:7-16, 32:13-33:2). So he may not be qualified. And his opinions are unreliable and do not fit the facts of this case.

"As we have made clear, 'the reliability analysis [required by *Daubert* ] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.'" *ZF Meritor, LLC*, 696 F.3d at 291 (alterations in original) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). "When an expert's opinion derives from fundamentally flawed data, it is nothing more than a 'castle made of sand,' and must be excluded." *In re: Chocolate Confectionary Antitrust Litig.*,

No. 08-MDL-1935, 2013 WL 11305184, at *2 (M.D. Pa. May 10, 2013) (internal citation omitted).

**A. Dr. Israel's Damages Calculation Should Be Excluded.**

**1. Dr. Israel's Use of an Incorrect Margin Makes His Calculation Unreliable.**

Dr. Israel's use of [redacted] 2009 forecast of Super Rewards' 2011 profit margin is unreliable on its face. [redacted] was a minority investor with no first-hand knowledge about the operations of Adknowledge or Super Rewards or industry background. (Ex. 5, at 24:1-12, 75:20-81:9, 90:12-91:12). No evidence exists about what method TCV employed to forecast the margin or who did it.

Based on actual results, Dr. Israel knows the [redacted] forecast turned out to be wrong. [redacted] estimated that Super Rewards' profit margin would be 4%. (Ex. 3 ¶ 82; Ex. 2, at 408:21-409:3). But in reality, its profit margin in 2011 was 9%. (Ex. 2, at 412:12-19). Dr. Israel conceded that "[redacted] didn't have the number right in 2011." (*Id.* at 414:1-6).

Similarly, PayPal's margins cannot be a reliable proxy for Super Rewards' margins. PayPal never competed with Super Rewards. Rather, as Dr. Israel conceded, PayPal was a "supplier" to Super Rewards and other virtual-currency-service providers. (*Id.* at 266:13-22). Facebook's Dan Levy conceded that PayPal was not a competitor to virtual-currency service providers like Facebook. Ex. 6, at 58:17-59:3; 142:1-9. Facebook's internal documents say the same thing. *See, e.g.*, Ex. 7, at 2; Ex. 8, at 1; Ex. 9, at 2. Courts reject lost profits calculations when profit margins are based on another business "which was not shown to be comparable." *See, e.g.*, *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 209 n.21 (5th Cir. 2000).

Since Dr. Israel has substituted Super Rewards' actual profit margin with (a) an incorrect forecast and (b) a dissimilar company, his lost profits calculation is not reliable. *See, e.g.*, *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 274 (S.D.N.Y. 2010) (excluding lost profits opinion because the expert "failed to consider any of plaintiff's actual costs or its historical profit margin"); *cf. Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1574, 1577-80 (2d Cir. 1994); *All Pro Maids, Inc. v. Layton*, No. Civ.A. 058-N, 2004 WL 1878784, at *10 n.57 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005).

**2. Dr. Israel's Use of Social Ranger's Market Share After the Challenged Conduct Makes His Calculation Unreliable.**

When selecting a benchmark period to represent the but-for world, an expert "must examine an appropriate selection of data . . . . [and] may not 'cherry-pick' the time frame or data points so as to make her ultimate conclusion stronger." *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5775600, at *7 (E.D. Pa. Aug. 5, 2015) (citation omitted). But "cherry picking" is exactly what Dr. Israel did in using Super Rewards' market share from the second quarter of 2011 throughout his damages period. By that time, Facebook had already announced its Mandate, developers knew the July 1, 2011 deadline for implementation of the Mandate was imminent, and game developers had already left competing virtual-currency service providers in droves. (Ex. 3 ¶¶ 80-81; Ex. 2, at 396:22-397:8). By choosing a date after the Mandate was announced, Dr. Israel is using a market share that was already depressed by Facebook's improper conduct. Super Rewards' share had been cut in half from the year before. (Ex. 3 ¶ 80; Ex. 2, at 404:2-8).

Nor is there any support for Dr. Israel's alternative market share estimate, which takes Super Rewards' market share in 2011 and cuts it in half again. This calculation is based on an unfounded assumption that more than half the market would switch from third-party virtual

currency service providers to in-house services between the end of the second quarter of 2011 and the beginning of the third quarter – literally overnight – even though none of those game developers ever did. (Ex. 3 ¶¶ 81-82; Ex. 2, at 406:7-408:19).

**B. Dr. Israel's "Zero Economic Profits" Opinion Should Be Excluded.**

Dr. Israel's opinion that no virtual-currency services provider could earn more than "zero economic profits" is flatly contradicted by the real-world facts and Dr. Israel's own testimony. And so is his view that a competitive industry would prohibit lost profits exceeding a company's initial investment plus a risk-free interest rate. (*See* Section III(C), *supra*).

Dr. Israel conceded that companies can earn more than "zero economic profits" in numerous circumstances. These include when an "industry has not settled down to equilibrium" or when companies have "competitive advantages," including "proprietary technology . . . and strategic assets that competitors can't easily duplicate." (Ex. 2, at 226:21-228:12). Other factors that can lead to more than "zero economic profits" are "durable relationships with customers or suppliers," the "skill and experience of employees," from "brand names and reputation," and from "the ability to innovate." (*Id.* at 231:1-21).

Remarkably, Dr. Israel admitted that many of these conditions were present here. He testified that the market "was still evolving" and not "the position it would stay in forever" in 2010. (*Id.* at 272:10-17). He conceded there were "some firms earning relatively large returns on investment" before the challenged conduct, yet contradicted himself by opining that it would be impossible to do so. (*Id.* at 274:4-6). Dr. Israel admitted that Super Rewards had many of the characteristics of a company that could earn economic profits: (a) "technology to effectively

tailor advertising offers and payment options to particular users" (*id.* at 239:9-17)[3]; (b) relationships with payment providers and advertisers that others did not (*id.* at 231:22-232:12, 233:22-234:13); and (c) exclusive deals with game developers (*id.* at 235:17:236:8).[4] Dr. Israel's opinion disregards all of this and simply concludes that Super Rewards could not earn more than "zero economic profits." It is not based in reality, has no foundation, and would not assist the trier of fact.

### C. Dr. Israel's "Self-Inflicted Damages" Opinion Should Be Excluded.

Finally, Dr. Israel's opinion that Super Rewards' damages were somehow "self-inflicted" simply does not "fit" the case and would confuse the jury. Whether or not Super Rewards failed to innovate, failed to diversify, or had unattractive products after the Mandate, (*see* Section III(D), *supra*), is not relevant to any disputed issue. Social Ranger was entirely excluded from providing virtual-currency services to game developers on Facebook.com. Social Ranger did not (and could not have) "self inflicted" that harm. In truth, Dr. Israel opines that Super Rewards made these alleged poor business decisions *after* the harm causing the damages analyzed.

Dr. Leitzinger measured profits that Super Rewards lost only *on the Facebook Platform* through Facebook's allegedly anticompetitive conduct. (Ex. 1 ¶ 66). What Super Rewards did or failed to do after the Mandate in other markets (such as the mobile market), or with other products, does not relate to the damages it suffered in the relevant market.[5] (*See* Ex. 2, at 182:5-183:18, 186:8-188:6 (opinion relates to Super Rewards' business outside Facebook); 421:18-

[3] Dr. Israel specifically cited this technology as something that could give Super Rewards a competitive advantage that would boost profits. (*Id.* at 239:18-240:3, 252:6-15).

[4] Dr. Israel also conceded there were numerous other differences in the ways companies in the relevant market provided customer service and customization of advertising offers. Dr. Israel recognized that these differences could give a firm a competitive advantage, but he simply ignored them. (*Id.* at 254:1-256:14).

[5] Dr. Israel has no opinion on the scope of the relevant markets. (Ex. 2, at 185:22-186:7).

422:22 ("if they choose not to diversify into an obvious growing market, I think the jury could conclude that the failure to make profits was as a result of not being run the way a successful company would be run.")).[6]

Dr. Israel's "self-inflicted damages" opinion has no legal relevance, and it should not be allowed to contaminate the trial. The jury will only get to a damages calculation if it accepts the market definitions of Plaintiff, which does not include mobile platforms. Dr. Israel's opinion that Super Rewards should have diversified into mobile platforms is therefore an improper attempt to carry over the parties' market dispute into the damages portion of the case. Expert testimony does not "fit" the case and is inadmissible if "admitting the evidence would overwhelm, confuse, or mislead the jury." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994). (*See also* Ex. 2, at 195:5-20 (Dr. Israel had no "understanding about what [Social Ranger's] obligation is under the law" after the Mandate)). Dr. Israel's testimony here is not relevant to any issue, and Facebook should not be permitted to inject it into the trial.

## **V. CONCLUSION**

For the foregoing reasons, Social Ranger respectfully requests that the Court exclude Dr. Israel's opinions as described herein.

Dated: March 24, 2017

By: *_/s/ Kenneth L. Dorsney_*
Kenneth L. Dorsney (I.D. #3726)
**Morris James LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com

[6] Notably, Dr. Israel made clear that his opinion was not an opinion about mitigation of damages. (*See id.* at 196:5-11 ("I don't consider what we're talking about to be mitigation. I consider it to be understanding the causes of their poor performance."); 424:20-21 ("I don't think of it as lessening the damages in the mitigation sense.")). Nor could it be, as Dr. Israel makes no effort to measure any failure to mitigate. *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 258-59 (3d Cir. 2008) (requiring "the amount by which the damages would have been reduced").

Derek A. Newman (*pro hac vice*)
Derek Linke (*pro hac vice*)
Jason Sykes (*pro hac vice*)
**Newman Du Wors LLP**
2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800
dn@newmanlaw.com
linke@newmanlaw.com
jason@newmanlaw.com

Brian R. Strange (*pro hac vice*)
Keith L. Butler (*pro hac vice*)
Cindy Z. Reichline (*pro hac vice*)
**Strange & Butler**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
bstrange@strangeandbutler.com
kbutler@strangeandbutler.com
creichline@strangeandbutler.com

Bruce Van Dalsem (*pro hac vice*)
Harold A. Barza (*pro hac vice*)
Kevin Teruya (*pro hac vice*)
Michael Lifrak (*pro hac vice*)
David Elihu (*pro hac vice*)
Alyssa L. Greenberg (*pro hac vice*)
**Quinn Emanuel Urquhart & Sullivan, LLP**
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
brucevandalsem@quinnemanuel.com
halbarza@quinnemanuel.com
kevinteruya@quinnemanuel.com
michaellifrak@quinnemanuel.com
davidelihu@quinnemanuel.com
alygreenberg@quinnemanuel.com

**ATTORNEYS FOR PLAINTIFF
SOCIAL RANGER, LLC**