**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

SOCIAL RANGER, LLC, a Delaware limited liability company,

*Plaintiff*,

v.

FACEBOOK, INC., a Delaware corporation,

*Defendant*.

**C.A. NO. 14-1525-LPS**

**REDACTED VERSION**

**PLAINTIFF SOCIAL RANGER, LLC'S REPLY IN SUPPORT OF ITS MOTION TO PRECLUDE FACEBOOK, INC.'S EXPERT MARK ISRAEL FROM PROVIDING TESTIMONY AT TRIAL**

Kenneth L. Dorsney (I.D. #3726)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com

Dated: April 17, 2017

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF THE ARGUMENT ....................................................................... 1

II. ARGUMENT ....................................................................................................... 1

A. Dr. Israel's Use of an Incorrect Margin Makes His Calculation Unreliable. .......... 1

B. Dr. Israel's Use of Social Ranger's Market Share After the Challenged Conduct Makes His Calculation Unreliable. ........................................................... 3

C. Dr. Israel's "Zero Economic Profits" Opinion Should Be Excluded....................... 4

D. Dr. Israel's "Self-Inflicted Damages" Opinion Should Be Excluded...................... 5

III. CONCLUSION ..................................................................................................... 5

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000.) ..... 4

*JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*,
1998 WL 175888 (E.D. Pa. 1998), *aff'd* 178 F.3d 1279 (3d Cir. 1999) ..... 2, 4

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ..... 2

## I. SUMMARY OF THE ARGUMENT

Dr. Israel's opinions are fundamentally flawed in four ways. He uses a profit margin that is demonstrably wrong. He uses Super Rewards' market share in mid-2011 as a benchmark, even though it was already infected by Facebook's anticompetitive conduct. His radical opinion that Super Rewards' could never achieve more than "zero economic profits" is provably wrong because Super Rewards did so in the real world and had the objective characteristics, identified by Dr. Israel himself, to continue to do so. His opinion that Super Rewards "self-inflicted" harm after the challenged conduct is irrelevant to the damages caused by Facebook and has no connection to the parties' claims.

Nothing Facebook says in its opposition changes any of this. Facebook does not dispute that the profit margin used by Dr. Israel "turned out to be wrong." (D.I 325 at 7.) Facebook concedes that Dr. Israel uses the company's mid-2011 market share even though "Super Rewards' share was declining rapidly during the first half of 2011," immediately after Facebook announced the Mandate. (*Id.* at 8.) Facebook cannot point to any evidence to support Dr. Israel's "zero economic profits" opinion other than the fact that there was competition in the virtual-currency services market before Facebook destroyed it. (*Id.* at 4-5.) And Facebook cannot articulate how Dr. Israel's opinions regarding Super Rewards' alleged "bad business decisions" after the Mandate has anything to do with any issue the jury will decide. (*Id.* at 9-10.)

Dr. Israel's opinions should be excluded.

## II. ARGUMENT

### A. Dr. Israel's Use of an Incorrect Margin Makes His Calculation Unreliable.

For Super Rewards' margin in the but-for world, Dr. Israel uses a 2009 forecast of Super Rewards' margins starting in 2011. (D.I. 316 at 3.) The forecast was wrong. It shows a 4% margin in 2011, and Super Rewards' actual margin was more than double that. (*Id.* at 6.)

Facebook argues that the forecast is not from a "random source[]" but rather a report done for Adknowledge by [redacted], an outside investor. (D.I. 325 at 6.) But it remains undisputed that neither Facebook nor Dr. Israel know how the margin was forecast or who did it. (D.I. 316 at 3.) As Facebook itself recognized, an expert's reliance on a document is improper if he "did not know either the qualifications of the individuals who prepared the [documents'] estimates or the assumptions upon which the estimates were based." (D.I. 318 at 5) (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290-91 (3d Cir. 2012).)

And even more fundamentally, it remains undisputed by Facebook and Dr. Israel that [redacted] estimate of Super Rewards' 2011 margin (which Dr. Israel uses as his benchmark) was off by more than 100%. (*See* D.I. 325 at 7 (forecast "turned out to be wrong"); D.I. 317, Ex. 2 at 414:1-6 (Israel conceding that "[redacted] didn't have the number right in 2011.").) As Facebook realizes, "expert testimony that ignores existing data and is based on speculation is inadmissible." (D.I. 318 at 10) (quoting *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, at *6 (E.D. Pa. 1998), *aff'd* 178 F.3d 1279 (3d Cir. 1999).)

Facebook next asserts that [redacted] incorrect margin estimate is reliable because it was focused on direct-pay services. (D.I. 325 at 7.) However, Super Rewards' margins were *higher* on direct pay compared to offer ads. (D.I. 324, Ex. 15, at 7 ("Offer net margins are significantly less than direct pay").) Far from providing a justification, the supposed change in the "mix" of the business renders Dr. Israel's reliance on [redacted] number even more indefensible.[1]

[1] The Court should disregard Facebook's repeating the misleading statement that Adknowledge's CEO expected 5% margins on direct pay services in the future. (D.I. 325 at 7.) That view assumed that Facebook would charge a 5% (not 30%) fee for its virtual-currency services. (D.I. 323 at 9.) Since Facebook did not, Super Rewards was not constrained on margin. Rather, Super Rewards' margins actually trended upward after Facebook tried to compete with its Credits product. (*Id.*)

Finally, the fact that PayPal's margins were 3.73% has no bearing on this issue. PayPal was one of *hundreds* of payment and monetization options that Super Rewards presented to its developer customers. (D.I. 320.1, Ex. 3 at ¶¶ 27-29.) PayPal was (and is) a payment processor, not a competitor in the virtual-currency services market. (D.I. 325 at 7.) All Facebook can offer is the conclusory statement that Dr. Israel "concluded that PayPal was a reasonable benchmark." (*Id.*) But the margins of PayPal, a supplier to Super Rewards which was not comparable to Super Rewards itself, cannot be a reliable proxy. (D.I. 316 at 6.) This is particularly true when we *know* Super Rewards' margins were much higher than PayPal's and that they were improving, even as the industry was supposedly moving more to direct pay options. (*Id.*)

### B. Dr. Israel's Use of Social Ranger's Market Share After the Challenged Conduct Makes His Calculation Unreliable.

Dr. Israel's use of Super Rewards' market share in mid-2011 is unreliable because it was already depressed by Facebook's announcement of the Mandate in January 2011. (D.I. 316 at 7.) Facebook asserts that "Plaintiff does not cite a single instance of any business lost by Super Rewards" following the announcement. (D.I. 325 at 8.) But *on the very same page*, Facebook concedes that "Super Rewards' share was declining rapidly during the first half of 2011." (*Id.*) Indeed, after the Mandate was announced, Super Rewards' share was cut in half over the next six months, despite rapidly increasing its market share in preceding years. (D.I. 316 at 7.) Dr. Israel's use of this tainted market share as a benchmark is unreliable. (*Id.*)

Dr. Israel's alternative market share estimate, which cuts Super Rewards market share in half again, is also inadmissible. (D.I. 316 at 7-8.) Whereas Dr. Leitzinger's calculation assumes the status quo, Dr. Israel assumes that [redacted] the market would completely self-provide virtual currency services overnight on July 1, 2011, even though *none did so in the actual world, ever*. (*Id.*) In the words of Facebook, a "lack of a factual basis for [an expert's] assumptions

cannot be cured by his own assertions about what he thinks would happen." (D.I. 318 at 9.)[2]

As Facebook also stated, "reliability requires that the expert's methodology be based upon the proper factual foundation." (D.I. 317 at 2) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 754-55 (3d Cir. 2000.) And "[t]estimony by purported damages experts that lacks a reliable foundation is inadmissible." (*Id.* (quoting *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, at *11 (E.D. Pa. 1998), *aff'd* 178 F.3d 1279 (3d Cir. 1999).) There is no foundation for Dr. Israel's conclusions about Super Rewards' market share except for his own *ipse dixit*.

**C. Dr. Israel's "Zero Economic Profits" Opinion Should Be Excluded.**

Facebook tries to spin Dr. Israel's opinion into being that Super Rewards would not earn more than a "competitive rate of return over time." (D.I. 325 at 4.) But Dr. Israel's opinion is much more radical than that. He opines that neither Super Rewards nor any of its competitors could earn more than "zero economic profits" and that no firm in a competitive industry could ever earn as lost profits more than its initial investment plus a risk-free interest rate. (D.I. 316 at 11-12.) This is contradicted by the facts and Dr. Israel's own testimony.

Again, real world facts contradict Dr. Israel's opinions. Super Rewards earned more than "zero economic profits" in the actual world, which directly contradicts Dr. Israel's theory. Super Rewards went from a company with minimal capital investment in 2007 to one worth at least [redacted] (based on a third-party purchase of a minority equity interest in Adknowledge by private equity firms JMI and Texas Pacific Group, and Nokia's investment division). (D.I. 324, Ex. 6 at ¶¶ 14, 37, 41, Ex. 3.)

Dr. Israel himself provides the reasons why Super Rewards' explosive growth occurred –

[2] As it did in its motion to exclude Dr. Leitzinger, Facebook misleadingly argues he opined that [redacted] of all payment volume was "attributable to developers earning sufficient revenue to self-provide VCS." (D.I. 325 at 9.) However, Dr. Leitzinger said no such thing. *See* D.I. 323 at 7.

the market was evolving, and Super Rewards had effective technology as well as established relationships with advertisers and payment providers. (D.I. 316 at 9.) Facebook argues that these competitive advantages were not sustainable, (D.I. 325 at 5), but it offers no evidence for Dr. Israel's assumption (yet again) that the actual world would have changed in the future.

Finally, Facebook's assertion that Super Rewards "does not dispute this model or methodology" (*Id.* at 5) is wrong. As Super Rewards made clear in its motion, it is "not based in reality, has no foundation, and would not assist the trier of fact." (D.I. 316 at 9.)

**D. Dr. Israel's "Self-Inflicted Damages" Opinion Should Be Excluded.**

Dr. Israel's opinion that Super Rewards' damages were somehow self-inflicted should also be excluded. It is not relevant to damages or any issue in the case. (D.I. 316 at 9-10.)

Facebook asserts that Dr. Israel's opinion is not limited to "Super Rewards' poor performance after the challenged conduct." (D.I. 325 at 10.) But Dr. Israel testified to the *opposite*. (D.I. 317, Ex. 2, at 154:8-22 ("The only opinions I plan to offer are on the damages period. . . So that explicitly refers to what's explaining Super Rewards' poor performance *after the challenged conduct*. . . . [T]he relevant opinion is about what was the cause of the observed performance *after the challenged conduct*.") (emphasis added)).) And even if Dr. Israel had opinions about Super Rewards' "bad business decisions" before Facebook's anticompetitive behavior, those decisions are not relevant to the harm to Super Rewards caused by Facebook.

Facebook also does not argue why Super Rewards' performance outside the relevant market after the challenged conduct is relevant, other than a quotation from Dr. Israel saying it is. (D.I. 325 at 10.) It is not. (*See* D.I. 316 at 9-10 (explaining irrelevance and likelihood of jury confusion).)

## III. <u>CONCLUSION</u>

Dr. Israel's flawed opinions should be excluded.

Dated: April 17, 2017

By: *_____/s/ Kenneth L. Dorsney_____*

Kenneth L. Dorsney (I.D. #3726)
**Morris James LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com

Derek A. Newman (*pro hac vice*)
Derek Linke (*pro hac vice*)
Jason Sykes (*pro hac vice*)
**Newman Du Wors LLP**
2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
dn@newmanlaw.com
linke@newmanlaw.com
jason@newmanlaw.com

Brian R. Strange (*pro hac vice*)
Keith L. Butler (*pro hac vice*)
Cindy Z. Reichline (*pro hac vice*)
**Strange & Butler**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
bstrange@strangeandbutler.com
kbutler@strangeandbutler.com
creichline@strangeandbutler.com

Bruce Van Dalsem (*pro hac vice*)
Harold A. Barza (*pro hac vice*)
Kevin Teruya (*pro hac vice*)
Michael Lifrak (*pro hac vice*)
David Elihu (*pro hac vice*)
Alyssa L. Greenberg (*pro hac vice*)
**Quinn Emanuel Urquhart & Sullivan, LLP**
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
brucevandalsem@quinnemanuel.com
halbarza@quinnemanuel.com
kevinteruya@quinnemanuel.com
michaellifrak@quinnemanuel.com
davidelihu@quinnemanuel.com
alygreenberg@quinnemanuel.com

**ATTORNEYS FOR PLAINTIFF**
**SOCIAL RANGER, LLC**